**In the Matter of MAPLEWOOD POULTRY COMPANY, Clements Chicks, Inc., Pierce Realty Company, Northern New England Feed Co., Debtors in Possession.**

**Bankruptcy Nos. BK 79–147ND, BK79–148ND, BK79–158ND and BK79–159ND.**

United States Bankruptcy Court, D. Maine.

Jan. 23, 1980.

See also, Bkrtcy., 2 B.R. 550.

Daniel W. Mooers, Reefe & Mooers, Portland, Me., for debtors.

Richard E. Poulos, Portland, Me., for receiver.

## MEMORANDUM DECISION

CONRAD K. CYR, Bankruptcy Judge.

 The issue presented for decision is whether to appoint a receiver to supervise the further administration of these proceedings. In its consideration of that issue the court has exercised its discretionary power under Federal Rule of Evidence 201 to take judicial notice of all administrative and judicial actions previously undertaken in these proceedings.

The debtor in possession,[1] frequently in concert with its present owners, management, and the creditors' committee, has pursued a policy of procrastination to which no party in interest has taken exception. Economic development and jobs are the unassailable slogans behind which the debtor has skillfully maneuvered to perpetuate its own position by cajoling adverse parties to forbear from requesting the appointment of a receiver,[2] notwithstanding violations of court orders, extremely heavy operating losses, dwindling assets, further deterioration of the debtor's disadvantageous competitive position in the broiler industry, a worsening broiler market, depreciating plant and equipment, delays and shattered expectations.

---

**1.** Although there are four separate affiliated entities involved in these proceedings, the court refers throughout to Maplewood Poultry Company, the principal entity.

**2.** Chapter XI Rule 11–18(b) contemplates the appointment of a receiver in a Chapter XI case on the application of a party in interest. Bankruptcy Rule 11–18(b).

In mid-November, counsel for the creditors' committee insisted that the court fix an abrupt deadline for the filing of an arrangement. The debtor in possession resisted that request on the grounds that Acton Corporation was actively negotiating for the purchase of Maplewood. When it became apparent, on November 30, 1979, that Acton Corporation would not purchase, the debtor opposed imposition of a deadline for the filing of an arrangement on the grounds that efforts were in progress to obtain federal agency financing. The court has yet to learn that any application for federal agency (or other) financing was ever filed.

Finally, in the face of mounting losses, declining reorganization prospects, and inaction by interested parties, the court issued an order to show cause why a receiver ought not be appointed. At the hearing on December 10, 1979, the debtor requested thirty days within which to file a plan, with no deadline for obtaining creditor acceptance. Counsel for the creditors' committee supported the request and no party appeared in favor of the appointment of a receiver. Acting on assurances that management of the company would be promptly replaced and that the present owners were eager to facilitate a plan of arrangement by transferring stock ownership and control as required to enable a feasible arrangement, the court took no action regarding the appointment of a receiver and fixed January 10, 1980 as the deadline for obtaining creditor acceptance of an arrangement.

On January 10, 1980, the court once again held a hearing at which the debtor admitted its inability to file a plan, but urged that it had been unable to develop a plan because the only prospective investor, Maine Poultry Bargaining Cooperative, Inc.,[3] demanded a feasibility study before proceeding with further negotiations. No credible explanation was forthcoming as to why the urgent need for a feasibility study had not been recognized earlier, not only by Maine

Poultry Bargaining Cooperative, Inc. but by the debtor in possession and the creditors' committee. Nevertheless, all interested parties supported the debtor's request for further time within which to obtain a feasibility study. The court fixed January 18, 1980 as the deadline for filing phase I of the feasibility study. The debtor later requested and received an extension to January 21, 1980.

On January 17, 1980, the debtor in possession applied for modification of the order entered December 5, 1979 fixing the minimum live bird inventory level at 1,000,000, on the grounds that the debtor was without funds with which to comply with that requirement. The court scheduled a further hearing for January 21, 1980, together with a hearing on order to show cause why the order authorizing the debtor to operate its business ought not be vacated, why the debtor ought not be adjudicated a bankrupt and why a receiver ought not be appointed.

It is the position of the debtor in possession that its live bird inventory must be liquidated through a "winding down" operation, with the net proceeds, after costs, to be held for distribution among competing secured claim holders. The court is informed that creditors claiming security interests in the live bird inventory have agreed to proceed in that manner, as has the creditors' committee. It is further recommended by the debtor that phase II of the Krueger feasibility study should proceed at the expense of the Maine Department of Agriculture. Once again, all parties appear to be in agreement, as is the State of Maine.

Counsel for the debtor in possession urges that the court not adjudicate the debtor a bankrupt and that it not appoint a receiver. It is argued that an adjudication in bankruptcy would abort the reorganization effort and that the appointment of a receiver would merely mean unnecessary expenses of administration. These arguments merit careful scrutiny.

---

**3.** During the course of a conference in chambers on January 10, 1980, counsel for present management suggested to counsel for the Maine Poultry Bargaining Cooperative, Inc. that present management would prefer to negotiate with a cooperative comprised of Maplewood's present contract growers. *See* note 11 *infra*.

The testimony of Robert Krueger and phase I of his report[4] indicate that the business of the debtor in possession may be viable, but not without the infusion of substantial amounts of new capital for improvements in plant and equipment (approximately $869,000),[5] over and above its working capital needs.

Krueger further maintains that one of the eight basic requisites of a successful broiler operation,[6] and a major one,[7] is that the company be integrated.[8] Since the commencement of these proceedings, Maplewood has liquidated various operations and interests essential to integration,[9] thereby regressing from, rather than progressing toward, an integrated company structure.[10] Yet Krueger attributes no capital or other costs to the reacquisition of those interests and operations essential to integration which have been liquidated by the debtor, much less to the acquisition of operations never before owned or controlled by Maplewood. Moreover, Krueger does not explain how integration can be abandoned as a company goal without sacrificing profitability and reorganizability. It is apparent to the court, for instance, that the absence of company-owned terminal market sales distributorships, not to mention pullet and laying breeder capacity, feed delivery, hatchery and offal rendering facilities, utterly precludes meaningful integration, except at costs which would dwarf the capital outlays identified by Krueger. The present record strongly suggests, therefore, that the reorganizability of Maplewood has been viewed with unwarranted optimism, even when weighed against the standards Krueger himself propounds. Yet these infirmities cannot compare with the wish and surmise of which the balance of the debtor's case consists.

The debtor in possession has continually asserted that there may be interest on the part of others in providing the capital with which to fund a plan and reorganize its broiler business. Yet on no occasion has the court received any credible evidence to substantiate that contention. The Maine Poultry Bargaining Cooperative, Inc. has demanded that a Krueger feasibility study be prepared as a prerequisite to any investment in the debtor's business. The Maine Poultry Bargaining Cooperative, Inc. refused, however, even to advance $5,000 to finance phase II of the Krueger study. It would not be prudent to rely upon the willingness or ability of Maine Poultry Bargaining Cooperative, Inc. to commit substantial capital to the reorganization of Maplewood in the face of its unwillingness or inability to fund the feasibility study deemed by it to be indispensable.[11]

The court has been presented with no reliable basis upon which to premise the hopes and expectations advanced by Maplewood and the creditors' committee for the eventual reorganization of the broiler operation. The only reliable evidence before the court, incomplete and conflicting as it is in other respects, plainly points to the fact that no reorganization of the broiler operation can even be considered possible, much

---

4. See Appendix I, *Proposed Feasibility Study for Reviving Maplewood Poultry Company* (January, 1980), filed January 21, 1980 [hereinafter referred and cited to as phase I].

5. Phase I, at p. 13 of Maplewood Feasibility Study, Part I.

6. Phase I, at p. 2 of Feasibility Study Outline.

7. Phase I, at p. 4 of Maplewood Feasibility Study, Part I.

8. Krueger defines "integration" to mean that the company owns or controls "all the functions necessary to produce, process and market broilers." Phase I, at p. 4 of Feasibility Study Outline.

9. Phase I, at pp. 4–5 of Maplewood Feasibility Study, Part I.

10. See note 9 *supra*.

11. The court was informed on January 21, 1980 that unidentified Maplewood growers may be considering the formation of a cooperative, but that they are likewise unable to finance the feasibility study. It should be noted that the action here taken by the court in no way delays or obstructs whatever plans such growers, or for that matter Maine Poultry Bargaining Cooperative, Inc., may have for participation in any further reorganization of the debtor or its business. See note 3 *supra* and accompanying text.

less probable, within one year, and then only with large infusions of fresh capital.

The interim proposal by the debtor in possession is to "wind down" operations by slaughtering and processing as many of the remaining 1,000,000 live birds as it is more profitable to feed, slaughter and process than it is to permit to perish. There are no specific plans or proposals for continuing operations beyond the time required to liquidate the remaining live bird inventory. The present reorganization prospects are so remote and conjectural that liquidation, not reorganization, must be considered the appropriate purpose of these proceedings for the time being.

Liquidation is generally not the proper function of reorganization proceedings, *In re Pure Penn Petroleum Co., Inc.*, 188 F.2d 851 (2d Cir. 1951), but the function of ordinary bankruptcy proceedings. Insolvent debtors ought not continue in control of their businesses under the umbrella of the reorganization court beyond the point at which reorganization no longer remains a realistic undertaking, unless liquidation would proceed more expeditiously and less expensively under the control of the debtor. There is nothing in the record of these proceedings to suggest that the debtor in possession is either better able or more motivated to proceed promptly with an efficient liquidation than is an experienced fiduciary whose commitment is to the promotion of parity among interested parties, rather than to self interest. In point of fact, there is ample evidence that equality in the distribution of the debtor's estate may be further frustrated by continuing the debtor in possession during liquidation. Similarly, there is every reason to believe

that the substantial cost savings realized by minimizing the fees and expenses of debtor's counsel and creditors' committee counsel should more than offset the fees and expenses of a receiver.

The debtor in possession has operated at a loss ever since and for some time prior to the commencement of these proceedings. Further processing operations will also be conducted at a loss. The often unnecessarily high operating costs of the debtor in the past were worsened, thus making Maplewood even more uncompetitive in the industry, by critical cash flow problems which prompted management to employ dubious expedients to enable day-to-day operations to continue.[12] In some instances, the measures taken by management constituted clear violations of valid court orders.[13]

The highly problematic projections offered to date by the debtor in possession leave little doubt that Maplewood may never become competitive vis-a-vis its more efficient broiler industry competition in the south, even under the best of circumstances.[14] It is no less clear that continued operations can only be allowed to proceed in the face of very heavy losses.

The broiler market outlook is bleak. During the ensuing six-month to one-year period, a continuation of the present downswing in the broiler price cycle is anticipated. The debtor's losses would continue at not less than $.04 per pound of dressed product. No less than one year would be required to reorganize company operations into an efficient integrated business organization and to secure the necessary capital with which to resume full-scale operations, not to mention the time and capital re-

---

12. Among these expedients were: (1) reduction of the feed given growing broilers due to lack of funds with which to purchase necessary ingredients; (2) mixing feed from whatever ingredients were available instead of according to formula, thereby sacrificing growth; (3) incurring heavy demurrage by detaining railroad cars due to lack of funds with which to obtain their release; (4) premature slaughter of live broilers at an uneconomical weight in order to accelerate cash proceeds with which to meet payroll and other operating costs.

13. The debtor in possession unilaterally reduced the live bird inventory level below the 2,000,000 minimum ordered by the court on September 18, 1979. At the same time, the court ordered the debtor in possession to keep on hand a minimum of 2½ days' feed supply. It is apparent that these orders have been violated as well. *See* note 12 *supra*.

14. *See* phase I, at pp. 11–12 of Maplewood Feasibility Study, Part I.

**550**

quired to achieve confirmation of a plan of arrangement with creditors.

The extremely heavy losses incurred between August 3 and December 30, 1979, approximating $1,311,949.68,[15] are no longer sustainable through reductions in live bird inventory. Maplewood has requested and received authorization by the court to liquidate its entire remaining live bird inventory, after which it will have no broilers to process. It will have no funds with which to replenish its live bird inventory. It will have no hatchery and no hatchery equipment. Whatever contract processing might be undertaken, such as the processing of fowl, would amount to a caretaker operation.

■ Yet the debtors in possession and the creditors' committee are as one in their insistence that liquidation should be conducted under their control, notwithstanding the fact that the reorganization effort has been aborted by circumstances and their own actions. Their dream that the debtor be resurrected following a long lapse into liquidation is hardly sufficient to warrant their continuation in office during liquidation. Liquidation is the function of experienced fiduciaries whose performance in office merits the confidence of the court.

Any adjudication of the debtor as a bankrupt, resulting from the fact that it failed to propose an arrangement within the time fixed by the court,[16] will be deferred pending further action by the receiver.

The within memorandum decision constitutes the court's findings of fact and conclusions of law.

---

15. Within less than five months since the commencement of the proceedings, the debtors experienced losses as follows:

16. See Bankruptcy Act § 376(2); 11 U.S.C. § 776(2).