**In re AUTO–TRAIN CORPORATION, a Florida Corporation.**

**Murray DRABKIN, Trustee of Auto-Train Corporation, Plaintiff,**

**v.**

**A. I. CREDIT CORPORATION, 70 Pine Street, New York, New York 10005, Defendant.**

**Bankruptcy No. 80–00391.
Adv. No. 80–0097.**

United States Bankruptcy Court, District of Columbia.

Feb. 13, 1981.

**160**

Murray Drabkin, Barry J. Dichter, Webster & Sheffield, Charles A. Docter, Docter, Docter & Salus, Washington, D. C., for plaintiff Auto-Train, as trustee.

Terence B. Quinn, Diane E. Ambler, Calvin H. Cobb, Jr., Steptoe & Johnson, Washington, D. C., for defendant A. I. Credit Corp.

## MEMORANDUM OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

(Trustee's Complaint to Void
Security Interest)

ROGER M. WHELAN, Bankruptcy Judge.

This adversary proceeding, instituted by the Trustee of Auto-Train against A. I.

Credit Corporation, hereinafter referred to as AICCO, a New York premium finance company, challenges the validity of AICCO's asserted security interest in unearned insurance premiums under eleven commercial insurance policies. The Premium Finance Agreements were entered into with Auto-Train in May 1980, and a notice of acceptance, the final act necessary for acceptance of the Premium Finance Agreement, was issued by AICCO from its New York office on June 5, 1980. On or about June 13, 1980, AICCO transmitted to each of the insurance carriers the required premium payments called for under the eleven insurance contracts. This was done in accordance with the provisions of a Premium Finance Agreement entered into between AICCO and Auto-Train. Under the terms of this agreement, AICCO was to advance the money necessary for Auto-Train's commercial insurance. Auto-Train was to then pay to AICCO a down-payment of $271,-469.00. Monthly payments were then to be made until the balance was paid in full. A check for the down-payment plus two installments was given to AICCO by Auto-Train; however, it was returned for insufficient funds in June of 1980. Sporadic payments were then made to AICCO from June through September 8, 1980 aggregating approximately $155,000.00. On September 8, 1980, when Auto-Train filed its petition for reorganization under Chapter 11, Auto-Train owed to AICCO the total sum of $1,248,093.54. Although a notice of intent to cancel Auto-Train's insurance was made by AICCO on July 25, 1980, no cancellation of insurance was ever effected. This was due to the automatic stay provisions of § 362 which became effective upon Auto-Train's filing of its petition of reorganization on September 8, 1980.[1] (See also Court

---

1. Based on prior negotiations between the parties, the parties to this litigation, through their respective attorneys of record, on December 3, 1980, entered into an escrow agreement whereby the value of the unearned insurance premiums (which are accruing at the rate of $3,718.00 per day) were to be deposited into a special escrow account according to a graduated scale of payments. (See Paragraph 3 (1 through 4), page 3 of the Escrow Agreement.)

Order of September 10, 1980.[2])

The essential facts in this proceeding are not in dispute. Based on the Trustee's complaint, as well as a subsequently filed post-trial memorandum dated January 21, 1981, the basis of the Trustee's attack revolves around an allegation of unenforceability of the agreement pursuant to 11 U.S.C. § 541(e) and 544. The Premium Finance Agreement is alleged to be unenforceable because it contains provisions contrary to public policy, violates applicable law and because it omits to make disclosures required by statute. The Trustee therefore maintains that the provisions of the Premium Finance Agreement, including the security agreement contained therein, must be denied enforceability against the Trustee. The Trustee, however, admits that the common-law obligation to make repayment would remain. The Trustee also seeks to avoid the claimed security interest on the ground that it is not properly perfected pursuant to applicable provisions of the UCC.

Specifically, the Trustee claims that the 10% per annum service charge in the Premium Finance Agreement exceeds the statutory maximum. The trustee alleges that the actual interest rate charged to Auto-Train is 16.229%.[3] The Trustee also maintains that the period of time for which the interest rate is calculated is incorrect.[4] The Trustee further alleges that, since the contract was executed with several blank spaces, this is in violation of the New York Banking Law. [§ 567(4)]

The Trustee, under Part II of the Trustee's Memorandum, also asserts a claim that the security interest is unenforceable against the Trustee, under 11 U.S.C. § 544 of the Code, because it was not perfected in accordance with the provisions of Article 9 of the Uniform Commercial Code. Finally, the Trustee argues that AICCO is adequately protected and not entitled to relief from the stay. For reasons set forth in this Memorandum Opinion, the Court concludes that the Premium Finance Agreement is enforceable against Auto-Train, is properly perfected in accordance with applicable law, and to the extent there is a valid security interest vesting in AICCO, this creditor is entitled to adequate protection as more fully detailed in this opinion.

## I. The Conflicts of Law Issue

The undisputed facts clearly establish that the Premium Finance Agreement, although executed by Auto-Train in the District of Columbia, was accepted by the defendant AICCO in the state of New York. Predicated on these facts, Auto-Train argues that the law of New York is applicable under the conflicts of law doctrine to be employed by the District of Columbia courts[5] because a contract "... is held to

---

**2.** In this Order, the Court directs that "A. I. Credit be, and it hereby is directed and enjoined to refrain from violating the provisions of § 362 of the Bankruptcy Code in cancelling, terminating or undertaking to cancel or terminate, or otherwise alter or affect adversely the insurance coverage provided under the Premium Finance Agreement referred to in the application herein ...."

**3.** See Plaintiff's Post-Trial Memorandum of January 21, 1981, p. 7, in which the Trustee sets forth his mathematic computation of the interest rate:
"The true interest rate is capable of mathematic computation based upon the evidence introduced at trial. The amount financed by AICCO was $834,406.87, the 'cash price' of $1,357,347.99 less the payment of $522,-941.12 to AICCO by Auto-Train made simultaneously with the loan advance (Def.'s Ex. No. 1 pp. 4–5; Def.'s Ex. No. 2). The loan

proceeds were advanced by AICCO on June 13, 1980 (Def.'s Ex. No. 1, p. 5). The finance charge, or interest on the loan, was $45,-745.55. The loan was to be repaid in monthly installments of $125,736.00 each, with the last payment on December 30, 1980 (Def.'s Ex. No. 2). The computation of the actual annual percentage rate was made utilizing standard loan repayment tables. A copy of this calculation is attached hereto as Exhibit B for the Court's convenience.

**4.** The Trustee in his post-trial memorandum of January 21, 1981, p. 7, maintains "the Premium Finance Agreement stated that the first installment is due on April 30, 1980, when in fact this could not be correct as the loan proceeds were not disbursed until June 13, 1980."

**5.** It is undisputed that the court is required to apply the conflicts of law doctrine of the District of Columbia, *See Klaxon Co. v. Stentor*

be made in the place wherein the last act occurs necessary to make the contract binding.[6]"

The defendant, on the other hand, distinguishing the cases cited by Auto-Train argues that "... application of an interest analysis resolves the conflicts of law in favor of the District of Columbia." (Defendant's Post-Trial brief, p. 6, filed January 21, 1981.) A review of recent cases involving choice of law issues in the District of Columbia[7] convinces the court that the "dominant contacts," "most significant relationship," or the "interest analysis" approach, as set forth in the Restatement (Second), Conflicts of Laws (1971), mandates the application of D.C. law to the relevant issues of this proceeding. In analyzing and determining the governing law, the Court should first break down the contractual relationship into the relevant issues and determine which jurisdictions may have contacts with the claim or transaction at issue. Then, the Court should analyze the policy considerations of each of the interested jurisdictions. In weighing these considerations the Restatement provides that the following be taken into account:

1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

2) ... the contacts to be taken into account in applying the principles of § 6

to determine the law applicable to an issue include:

a) the place of contracting

b) the place of negotiation of the contract

c) the place of performance

d) the location of the subject matter of the contract, and

e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied.[8] [Restatement (Second) Conflicts of Law § 188]

By weighing the factors as promulgated by the Restatement, the court must consider the following facts. Auto-Train maintains its principal place of business in the District of Columbia. While the premium financing agreement was accepted by AICCO in New York, it was to insure the interests of a D.C. based business. Accordingly, if one analyzes or compartmentalizes the separate factors of the Restatement, and applies such factors to the contract between AICCO and Auto-Train, the law of the District of Columbia would logically be applied. The District of Columbia has an obvious legitimate governmental interest in controlling premium finance agreements for corporations located and maintaining

---

*Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1115 (1941).

**6.** *Cary v. U. S. Hoffman Machinery Corp.*, 148 F.Supp. 748 (D.D.C.1957).

**7.** *Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 147 U.S.App.D.C. 14, 452 F.2d 1346, 1354 (D.C.Cir.1971); *Dovell v. Arundel Supply Corp.*, 124 U.S.App.D.C. 89, 361 F.2d 543, 544 (D.C.Cir.) *cert. denied*, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966). *Williams v. Rawlings Truck Line*, 123 U.S.App.D.C. 121, 357 F.2d 581, 584–585 (D.C.Cir.1965); *Tramontana v. S. A. Empresa De Viacao Aerea Rio Grandense*, 121 U.S.App.D.C. 338, 350 F.2d 468, 471–474 (D.C.Cir.1965) *cert. denied*, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); *Legg, Mason*

*& Co. v. Mackall & Coe, Inc.*, 351 F.Supp. 1367 (D.D.C.1972).

**8.** The Restatement (Second) Conflicts of Law § 6 enumerates those factors which are relevant to the choice of law:

a) the needs of the interstate and international systems, b) the relevant policies of the forum, c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, d) the protection of justified expectations, e) the basic policies underlying the particular field of law, f) certainty, predictability and uniformity of result, and g) ease in the determination and application of the law to be applied.

their place of business in this jurisdiction. Foreign corporations, who in turn derive revenue or other benefits from such D.C. businesses, must obviously be aware of the statutory protections available to such businesses in an insurance context. For these reasons, the court feels compelled to adopt the substantive law of the District of Columbia as the controlling law in this proceeding.[9]

## II. Enforceability of the Premium Finance Agreement

■ The Premium Finance Agreement (attached as Exhibit A to Plaintiff's Complaint) is an enforceable agreement pursuant to the law of the District of Columbia.[10] Specific items required to be disclosed pursuant to the District of Columbia Code are set forth in the Agreement. More importantly, the interest calculations based on a maximum rate of $6.00 per $100.00 per year as called for in the District of Columbia Code results in a permissible interest factor of $48,864.55.[11] The permissible interest factor, accordingly, is in excess of that which was actually charged by AICCO in this case, which is the sum of $45,745.55. Moreover, the D.C.Code permits a $10 charge for each separate Premium Finance Agreement, which charge was apparently not assessed by AICCO in this case. The plaintiff's error in computing an interest rate in excess of 16% arises from the erroneous application of a 7-month period of time in determining the applicable interest

or discount factor under these same facts. However, as evidenced by the Premium Finance Agreement itself, the insurance policies were undisputably in effect from March 31, 1980 through the date of the final installment in December 1980. Although the premium loan was not actually final until acceptance on June 13, 1980, the parties agreed that the coverage would be from April 1980.

■ As noted in that portion of the opinion dealing with the conflicts of law issue, the Court is of the opinion that the better reasoned approach is that which is mandated by the Restatement on Conflicts of Law (Second) and those recent District of Columbia cases dealing with the dominant contacts or significant relationship approach. However, even if this Court were to apply the substantive law of New York to the Premium Finance Agreement, the result would be no different. First, as to those matters involving the violation of the statutory provisions regulating the amount of interest charged for Premium Finance Agreements, the Court notes that the New York Banking Law sets forth the controlling formula in Ch. 2, Art. 12–B, 568(4)(b). By employing the statutory formula called for under the New York Code, it is clear that the amount of interest actually assessed in this case is far below the permissible amount allowed under the New York law.[12]

---

**9.** Even if this court were to adopt the law of the state of New York, as maintained by the plaintiff Trustee, the result would be no different.

**10.** 35 D.C.Code § 1368(a)(3) requires that the following matters be disclosed; namely,
(A) the total amount of the premiums,
(B) the amount of the downpayment,
(C) the principal balance [the difference between items (A) and (B)].
(D) the amount of the service charge,
(E) the balance payable by the insured [sum of items (C) and (D)], and
(F) the number of installments required, the amount of each installment expressed in dollars, and the due date or period thereof.

**11.** 35 D.C.Code § 1369 limits the allowable service charge to "$6.00 per $100 per year, plus an

additional charge of $10 per Premium Finance Contract which need not be refunded upon cancellation or prepayment." Accordingly, the allowable interest is calculated as follows:

$$\frac{\$1,085,878.99 \times .06 \times 270}{360} = \$48,864.55$$

**12.** $\dfrac{\$1,085,878.99 \times .10 \times 270}{360} = \$81,440.92.$

Pursuant to § 568(4)(b) the amount of $10,858.78 will be subtracted from $81,440.92. The finance charge will then equal $70,582.14. Then, pursuant to § 568(4)(a)(3) a minimum service charge of $12 will be added to the finance charge. The allowable finance charge under New York law will thus be $70,594.14.

Second, assuming arguendo, the applicability of the Truth in Lending regulations [13] to this transaction, the correct application of the interest charges pursuant to 568(4)(b) effectively disposed of the plaintiff's argument as to the calculation of the true interest rate, as well as the time period for its calculation. This argument is therefore moot and will not be further discussed.

■ As to the issue of the execution of the Premium Finance Agreement with several "blank spaces", the D.C.Code does not address the ramifications of issuing a premium financing agreement containing blank spaces. However, the New York Code has addressed this issue. The Court will therefore look to the New York law for guidance, but the Court is not bound by New York law on this issue. Under New York law "no premium finance agreement shall be signed by an insured when it contains any blank space to be filled in after it has been signed . . . " [14]. This language clearly envisions that the premium finance company can leave no spaces blank where information is " . . . to be filled in *after it has been signed*." [emphasis added] Here the uncontradicted evidence of record clearly establishes that the blank spaces were not to be filled in at some subsequent time, but rather were purposely left blank because they were not "not applicable." (Testimony of Robert Keating) It is clear that the rationale for the New York statutory protection relates to the execution of an agreement containing blank spaces where subsequent information is to be later inserted which potentially could be detrimental to the interests of the consumer, or contrary to the intent of the contract. Here, the evidence clearly establishes that there were no additional provisions to be inserted in these blank spaces.

### III. Validity of AICCO's Security Interest

■ The Trustee argues that the security interest of AICCO is unperfected because of the latter's failure to properly perfect its security interest by the filing of a financing statement pursuant to Article 9–302 of the Uniform Commercial Code. (28 D.C.Code 9–302) Despite the exclusionary language of 28 D.C.Code 9–104(g) relied upon by AICCO, the Trustee asserts that the " . . . right to a refund of the unearned premiums is *not* excluded from Article 9 by § 9–104(g)" because "the exclusion refers to rights *under* an insurance policy" and "the security here is a right to a *refund* of an overpayment." [emphasis in original] (*See* Plaintiff's Post-Trial Memorandum at 14.) To acknowledge in any way the tortured logic of the Trustee's argument would be to exalt form over substance. What is at issue is AICCO's rights to unearned premiums in the policies financed. While this right or security interest might generally be looked upon as a "refund of an overpayment", it arises under the insurance policy and is intimately linked to the unearned premi-

---

**13.** Although the statutory revisions of the New York law protects business entities [New York Banking Law, Insurance Premium Finance Agencies, Ch. 2, Art. 12–B, § 554(4), (6)], Section 567(3) clearly incorporates all of the disclosure requirements of the federal Truth-in-Lending law (15 U.S.C. § 1601 et seq.). Also, 15 U.S.C. § 1603(1) expressly exempts "[c]redit transactions involving extensions of credit for business or commercial purposes . . . "

The New York legislature was fully aware that commercial transactions of this sort would be excluded from the disclosure requirements. Such an interpretation is also supported by the legislative history of the New York statute which in part stated that:

"[t]he Federal law would thus be the governing law with respect to the disclosure of credit charges, and all consumer credit transactions would be subject only to the Federal requirements. While business and commercial lenders who in some cases are now subject to State Law requiring disclosure of credit charges would not be subject thereto, business and commercial borrowers are generally more sophisticated and less in need of the protection afforded by disclosure requirements than is the case with consumers." McKinney's Session Laws of New York, Legislative Memoranda at 2511 (1969).

**14.** This statutory provision is a separate and specific statutory enactment of the New York Code and would clearly appear to be a defense available to business entities as defined in § 554. Namely, an insured means a "person", and "person" is specifically defined to include individuals, corporations, business trusts and similar entities.

ums. Accordingly, the "refund" is not a vague or abstract contract right,[15] but is in reality a rebate arising from the unearned insurance premiums under each of the designated policies. The generalized concept of "refund", as argued by the Trustee, cannot exist in a conceptual vacuum—it, must, of necessity relate to a specific and underlying contract—in this case, a contract of insurance. Because of this necessary relationship, it is clearly a right arising *in or under* a policy of insurance.

Furthermore, this exclusion in 9–104 is mandated by the nature of the insurance contract itself.

> "Insurance policies can, in a sense, serve as collateral, by assigning an interest in a matured or unmatured policy—that is, by assigning a claim to insurance proceeds which have become payable but which have not been paid or by changing a beneficiary to transfer a potential interest to a creditor, as might be done in the case of life insurance. As has been pointed out, '. . . this exclusion applies to situations where the parties to a security agreement attempt to create a direct security interest in an insurance policy by making the policy itself the immediate collateral securing the transaction.' Insurance companies maintain records in which these transfers can be recorded, and apparently, such a system works satisfactorily." [footnotes omitted]. Henson, R., Secured Transactions Under the

Uniform Commercial Code, 25–26 (2d ed. 1979).

In this proceeding, by reference to the contract itself, it is clear that the insurance companies are on notice of AICCO's interest by reason of the premium finance provision set forth in the agreement. Accordingly, notice filing under the Uniform Commercial Code would be superfluous.[16] Moreover, the District of Columbia Code specifically exempts premium finance agreements from the filing requirements.[17] It is clear that such an exemption eliminates notice filing pursuant to Article 9–302 of the Code because rights "in or under a policy of insurance" are not only excluded from the coverage of the Uniform Commercial Code but are expressly exempt under D.C. statutory provisions which relate directly to the matter at issue. Other bankruptcy courts have taken a position consistent with the holding of this Court in respect to premium finance agreement filing requirements under the UCC.[18]

## IV. Concept and Application of Adequate Protection to the Facts of this Proceeding

The Trustee argues that if AICCO is entitled to adequate protection, that right exists or is to be measured from ". . . the date from which the Court orders either relief from the automatic stay or adequate protection." This is so, according to the Trustee, because ". . . such protection can be no

---

**15.** The term "contract right" was generally deleted from the Uniform Commercial Code as a result of the 1972 Amendments to the Uniform Commercial Code, but is still retained in the D.C.Code (28 D.C.Code § 9–106) and would appear to include a right to a refund.

**16.** This is clear in connection with 35 D.C.Code § 1371(e) which specifically provides that:

"Whenever an insurance contract is cancelled in accordance with this section, the insurer shall return whatever gross unearned premiums are due under the insurance contract to the premium finance company effecting the cancellation for the account of the insured or insureds."

**17.** 35 D.C.Code § 1372 states:

"No filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a *secured transac-*

*tion* as against creditors, subsequent purchasers, pledges, and encumbrances, successors, or assigns. [emphasis added]

This sub-chapter of the District of Columbia Code, moreover, was enacted on April 18, 1966, approximately 1½ years after the effective date of the Uniform Commercial Code in the District of Columbia. It is clear, furthermore, that with specific reference to "a secured transaction" that this statutory exemption was to be an exception to the filing requirements set forth under Article 9–302.

**18.** *See In Re Kimball*, 2 B.R. 560 (Bkrtcy.W.D. Wash.1979); *In re Maplewood Poultry Co.*, 2 B.R. 550 (Bkrtcy.D.Me.1980); *In re Redfeather Fast Freight, Inc.*, 1 B.R. 446 (Bkrtcy.D.Neb. 1979).

greater than the value of the collateral on the date of such order." (Plaintiff's Post-Trial Memorandum at 20.)

■ While the concept of value is certainly a fluid one in bankruptcy and will be applied by the Court according to the unique circumstances of the case, the value is ultimately linked to the creditor's interest in and right to certain collateral. It, likewise, is not to be limited or restricted to a given point in time vis-a-vis the case or proceeding.[19] However, 11 U.S.C. § 361 is clearly designed to protect the secured creditor by assuring him that he will receive in value "essentially what he bargained for." [20] Accordingly, if the creditor has a valid security interest, enforceable against the Trustee, that security interest exists throughout the case and is not "pegged" to a particular juncture in the proceeding—although the value of the collateral itself may vary depending upon the juncture of the proceeding. The proper application of adequate protection has been appropriately summarized in these words:

> "The most important message of the Code with respect to the treatment of entities with an interest in property of the estate is that their remedies may be suspended, even abrogated, their right of recourse to the collateral may be terminated as it is consumed in the business, *but the value of their secured position as it existed at the commencement of the case* is to be protected throughout the case when adequate protection is required . . ." [emphasis added] 2 Collier on Bankruptcy, § 361.01 at 361–6 (15th ed. 1980)

In this proceeding the collateral has a stated and fixed value; namely, at the commencement of the Chapter 11 case the unearned premiums had a readily calculated value which has been admitted to be in the full sum of $762,346.40. For each day thereafter, the collateral, by the nature of and by reference to the provisions of the Premium Finance Agreement, declines at a daily per diem rate of $3,718.76. Accordingly, it is neither necessary nor proper to decide the value as of a given date, rather the value of the secured interest was determinable as of September 8, 1980, the date of the filing in this case, just as it is readily determinable as of this date. This is apparent by the terms of the escrow agreement that the parties negotiated and entered into. (See Paragraphs 31 through 34 of the Escrow Agreement, which mathematically provide for a graduated method of payment so that the entire amount of unearned premiums will be fully covered by March 31, 1981, the expiration period for the 11 insurance policies presently in force.)

While at any given date subsequent to September 8, 1980, the unearned premiums will always be proportionately lower than at any preceding date, this does not mean that the Court should arbitrarily hold that the "value" of the security interest is pegged to that date. To do so, either the Court, or the parties themselves, could force an arbitrary figure for such valuation by any number of delaying devices or tactics or by the vary nature of any adversarial process. Furthermore, as pointed out by the secured creditor in its brief (*See* Defendant's Post-Trial Brief, at 17) it is not the function of the Bankruptcy Court to furnish adequate protection—this obligation is one that falls to the Trustee or debtor-in-possession, as the case might be.[21])

---

19. It is clear, as was the approach employed by the Court in *American Kitchen Foods[, Inc. v. Hersch Cold Storage Co.]*, 435 F.Supp. 1127 (W.D.Pa.1976), that the value of the collateral may well be higher in a reorganization setting than in an outright liquidation case under Chapter 7. External circumstances, therefore, may well warrant a different holding as to the value of collateral at a given point in time; namely, while the collateral and the secured creditor's rights thereto will not ordinarily change, the assessment of value by the Court, at a particular time in the proceeding, may not always be the same.

20. H.R.Rep.No. 595, 95th Cong., 2d Sess. 339 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6295.

21. H.R.Rep.No. 595, 95th Cong., 2d Sess. 338 (1978).

Based on this Court's ruling, upholding the enforceability and validity of the agreement itself, AICCO is entitled to adequate protection from the inception of the case through the termination date of March 31, 1981.

Since the "value" of the collateral is readily ascertainable pursuant to the terms of the Premium Finance Agreement, the secured creditor should be entitled to the full amount of the accrued payments paid into an escrow fund by the Trustee. Pursuant to the payment provisions of the escrow agreement itself, the Trustee should continue to make the scheduled payments through the termination date of March 31, 1981. Assuming timely and full payments by the Trustee, pursuant to the provisions of this escrow agreement, the secured creditor will recover its "bargain" and the Trustee in turn will receive the existing coverage under the outstanding insurance policies. Furthermore, failure on the part of the Trustee to make such payments, in accordance with the provisions of the escrow agreement, will warrant cancellation of the policies pursuant to and in accordance with the requirements of 35 D.C.Code § 1371.

The defendant, AICCO, is instructed to furnish to this Court an appropriate order in accordance with the findings of this Court, with a copy to be served upon the Trustee, within three days.

IT IS SO ORDERED.