In re BIG SQUAW MOUNTAIN
CORP., Debtor.

A–I CREDIT CORP., Plaintiff,

v.

BIG SQUAW MOUNTAIN CORP.,
Debtor/Defendant,

and

Gary Growe, Esq., Trustee/Defendant.

Bankruptcy No. 90–10144.
Adv. No. 90–1037.

United States Bankruptcy Court,
D. Maine.

Dec. 21, 1990.

Stephen G. Morrell, Eaton, Peabody, Bradford & Veague, Bangor, Me. for defendant, trustee Gary Growe.

Richard Silver, Russell, Lingley & Silver, Bangor, Me. for plaintiff, A–1 Credit Corp.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

A–I Credit Corporation ("A–I") has moved for summary judgment seeking a determination that it is entitled to funds held by the trustee on account of a refund of unearned insurance premiums under policies previously insuring the Debtor, Big Squaw Mountain Corp. ("Big Squaw"). A–I claims an ongoing security interest in those funds by virtue of a premium financing agreement that it entered into with Big Squaw before the bankruptcy case was initiated. The motion is before the court on facts stipulated by the parties. Resolution of the dispute requires analysis of the relative rights of the parties under the Bankruptcy Code, the Uniform Commercial Code and the common law.

1. Written stipulations were filed. They were supplemented by oral stipulations made in response to the court's inquiries during hearings on the summary judgment motion. Because the facts have been stipulated, separately stated findings will not be set forth. *Cf.* B.R. 7052, F.R.C.P. 52.

2. A–I was not among the petitioning creditors.

3. The parties submitted a copy of the premium financing agreement as an exhibit to the factual stipulation. In pertinent part, the agreement provides:

   As security for the payments to be made, [Big Squaw is] assigning to [A–I] all unearned premiums on the policies financed, and all loss payments which reduce the unearned premiums. This means that this money can be used to pay amounts due under this agreement.

The parties' stipulations, coupled with a review of the court file, reveals the following factual context in which the instant dispute has arisen.[1]

### Background.

Involuntary Chapter 7 proceedings were initiated against Big Squaw Mountain Corporation ("Big Squaw") by a number of its unsecured creditors on March 19, 1990.[2] An order for relief was entered on June 24, 1990.

On December 21, 1989, Big Squaw entered into a premium finance agreement with A–I. The agreement was executed on A–I's behalf by Chalmers Insurance Agency ("Chalmers"), which functioned as A–I's agent. The contract was consummated within the State of Maine, and the parties agree that the agreement, having been validly executed, is a binding contract between A–I and Big Squaw.

Under the terms of their agreement, A–I extended credit to Big Squaw in the amount of $79,191.00. The funds were used to pay insurance premiums for policies issued to Big Squaw. The agreement assigned to A–I all of Big Squaw's interest in unearned premiums under the policy.[3] The agreement included a power of attorney extended by Big Squaw to A–I providing it with the right to cancel the insurance policy in the event of a default by Big Squaw.[4] Consistent with the assignment mentioned above, the financing agreement

The agreement recites that the total premium under the pertinent insurance policies was $105,589.00. Big Squaw provided a cash down payment of $26,398.00, and A–I financed $79,-191.00. Big Squaw agreed to repay the amount financed, together with finance charges in the amount of $1,300.59 in three payments of $26,-830.53, commencing January 5, 1990. Although the payments are denominated as "monthly" on the face of the agreement, the final payment was due on February 26, 1990.

4. The agreement states at paragraph 2:

   If [Big Squaw does] not make a payment when it is due or if [Big Squaw is] otherwise in default under this Agreement, [Big Squaw gives A–I] permission to cancel the policy.... (In legal terms giving [A–I] this power is the same as giving [A–I] a "Power of Attorney.")

expressly stated that, after cancellation, A–I had the right to "receive all refunds of unearned premiums" and to apply them to Big Squaw's indebtedness.[5]

Big Squaw failed to pay the final installment of $26,830.53 that was due to A–I on February 26, 1990. Pursuant to the powers extended to it under the financing agreement, A–I cancelled the insurance policy on March 31, 1990, complying in all respects with the notice and other obligations it had under the financing agreement.[6] Unearned insurance premiums of $26,840.53 were paid by the insurance carrier to Chalmers. On the date that the order for relief was entered, Chalmers was holding those funds. Subsequent to the entry of the order for relief, a trustee was appointed.[7] He later demanded that Chalmers pay over the unearned premium refunds that it held. Chalmers did so. The trustee holds the funds subject to such rights as A–I might have.[8]

The parties agree that the effect of the financing agreement between Big Squaw and A–I was to create a lien in favor of A–I in the unearned premiums under the policies purchased for Big Squaw.[9] The policies of insurance themselves include no provisions that serve to provide notice to third parties that the unearned premiums had been assigned to A–I. The financing agreement, of which A–I retained possession,[10] includes an anti-assignment clause

5. At paragraph 4, the financing agreement goes on to state that:

> [A–I] may act in [Big Squaw's] place (including signing [Big Squaw's] name) to do whatever is necessary to collect such refunds. The insurance company may rely on whatever [A–I] tell[s] them regarding the policy; it does not have to get any proof from [Big Squaw] or anyone else.

6. Cancellation was effected after the involuntary petition was filed, but before the order for relief was entered. As a post-petition action aimed at exercising control over, or enforcing a lien against, property of the estate, cancellation of the policy was an action subject to the stay of Code § 362(a)(3) and (a)(4). The involuntary case was "commenced" by the filing of the petition, Bankruptcy Code ("Code") § 303(b). The bankruptcy estate was created at commencement. Code § 541(a). The unearned premiums held by the insurance carrier were clearly property in which Big Squaw had an interest on March 19, 1990. The sequence of events stipulated to by the parties makes it clear that the premium refund was not made until after that date. Thus, prior to its delivery to the trustee, the refund was property of the estate, even while in Chalmers' hands.

Notwithstanding the fact that an apparent violation of the stay occurred, no party has asserted that the policy cancellation was void or that it should be avoided. The First Circuit has not held that all actions taken in violation of the stay are necessarily void. See In re Smith Corset Shops, Inc., 696 F.2d 971, 977 (1st Cir.1982) (some actions taken in violation of the stay may stand); Cf. In re Corporacion de Servcios Medicos Hospitalarios de Fajordo, 805 F.2d 440, 443–44 (1st Cir.1986) (holding that commonwealth court's action in going beyond limited scope of bankruptcy court's abstention order was without jurisdiction and therefore of no effect).

This case demonstrates why some post-petition actions violative of the stay should not be treated as void. See In re Schwartz, 119 B.R. 207 (Bankr. 9th Cir.1990) (generally discussing import of voidness vs. avoidability and holding that creditor action was voidable, rather than void). But cf. Makoroff v. Lockport, 916 F.2d 890 (3rd Cir.1990) (city's post-petition attempts to perfect tax liens termed void, but city had no pre-petition interest in property to be perfected under Code § 546(b)). To do so here would be to nullify the policy termination and to remove from the estate the potential benefit of a premium refund. Thus, whether it be seen as the trustee's ratification or adoption of A–I's post-petition actions, or characterized in some other way, the trustee's stipulation that the policy cancellation was "valid" controls.

7. A certificate appointing Gary Growe as Trustee, dated April 24, 1990, was entered on the court's docket on April 30, 1990.

8. The Trustee does not claim, and the parties have therefore not addressed, the issue whether Chalmers waived A–I's rights when it paid the money over to the trustee. Waiver is an affirmative defense under the Federal Rules of Civil Procedure and the Bankruptcy Rules. See F.R. C.P. 8(c); B.R. 7008. Because the party bearing the burden of raising and proving the defense has not done so, it is not an issue in the case.

9. The stipulation styles the arrangement a "security agreement." The agreement itself describes it as an "assignment" for security. The trustee and A–I agree that, as between A–I and Big Squaw, a first priority lien on the unearned premium was created.

10. That A–I retained possession of the financing agreement, but not of the policies, has not been formally stipulated by the parties. These facts, however, are not contested. They were asserted

that restricts Big Squaw's ability to assign the underlying policy.[11] A–I informed the insurance companies that Big Squaw had assigned the unearned premiums to it,[12] but it did not file a U.C.C. financing statement regarding the assignment.

### Discussion

A–I contends that there are no material facts in dispute and that, as a matter of law, it is entitled to a judgment that its lien claim is valid, perfected and senior to the interest of the estate in the unearned insurance premiums that were refunded when Big Squaw's insurance policies were cancelled. A–I urges that this dispute is governed by *In re Maplewood Poultry Co.*, 2 B.R. 545 (Bankr.D.Me.1980); and asserts that, as a premium financing arrangement, the relationship between itself and Big Squaw was outside the scope of Article 9 of the U.C.C.'s application. A–I contends that it was therefore not necessary for it to file a financing statement to perfect its lien on the funds. Rather, the financing arrangement and A–I's lien are, in A–I's view, governed by common law principles and, under those principles, A–I perfected its interest merely by retaining possession of the premium financing agreement. The trustee argues that the transaction is not excluded from the perfection requirements of Article 9 and, in the alternative, that if the issue is remanded to determination under the common law by exclusionary provisions in Article 9, A–I has nevertheless failed properly to cement its priority.

### 1. Summary Judgment Standards.

As an adversary proceeding, the question of entitlement to summary judgment is governed by application of Bankruptcy Rule 7056 which, in turn, makes F.R.Civ.P. 56 applicable. Under the rules and the case law applying them, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). If issues of fact need to be resolved before the dispositive legal issues can be adjudicated, summary judgment may not enter. *Jensen v. Frank*, 912 F.2d 517, 520 (1st Cir.1990); *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir.1990). Rule 56 requires that judgment be entered against a party that is unable to make a showing sufficient to establish the existence of an essential element to its case and on which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### 2. Governing Legal Principles.

In a case such as this, although the trustee's status is granted by federal law, state law will determine his rights against other parties claiming an interest in the debtor's estate. *In re Cushman Bakery*, 526 F.2d 23 (1st Cir.1975), *cert. denied* 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976); *In re Morse*, 23 B.R. 160, 161 (Bankr.D.Me.1982), *rev'd on other grounds*, 30 B.R. 52 (Bankr. 1st Cir.1983); *In re Maplewood Poultry Co., supra.* More specifically, the trustee's status as a judgment lien creditor as of the commencement of the case, conferred by Code § 544(a)(1) will, after application of pertinent state law principles, establish the priority of his claim to the funds in relation to the claim of A–I.

In *In re Maplewood Poultry, supra,* the court was faced with the requirement that, at the threshold, it determine which state's law would apply in a contest between the trustee and an entity that had provided financing for the Debtor's insurance premiums. As a consequence, the court applied the choice of law principles of

---

by counsel at oral argument and were stated in the parties' legal memoranda.

**11.** In paragraph 9 of the premium financing agreement, Big Squaw acknowledged:

I may not assign the Policy without your written consent. However, I do not need your written consent to add mortgagees or other persons as loss payees. You may transfer your rights under this agreement to anyone without my consent.

**12.** The affidavit of Mark Rydzak, A–I's employee with knowledge of its files, establishes that A–I timely dispatched notices of premium assignment to the carriers issuing the policies. The affidavit is unchallenged.

the forum state, and determined that, under Maine's conflict-of-law rules, the substantive law of New Jersey applied. 2 B.R. at 553–554. In the instant case, the parties have agreed that the law of Maine applies and, because the agreed choice of law would be recognized by a Maine court, the inquiry need go no further.[13]

### 3. *Uniform Commercial Code Issues.*

■ The parties disagree whether U.C.C. § 9–104(g)[14] removes the premium financing arrangement between A–I and Big Squaw from the U.C.C.'s requirements for perfecting a security interest through filing of a financing statement. That section operates to exclude certain secured transactions, including those relating to insurance policies, from Article 9's operation.[15] Exclusion means that, although the transaction is a secured transaction that would otherwise be subject to Article 9's requirements, the drafters chose to except it because it was of a character that rendered it subject to sufficient regulation by other statutes or because it dealt with a special type of transaction that does not fit easily into the general commercial pattern.[16]

The Trustee contends that the transaction at hand is not removed from operation of Article 9 by the statute's exclusionary provision and, therefore, that the rights of A–I must be considered under the U.C.C.'s attachment, enforcement and perfection provisions.[17]

Premium financing arrangements such as the one between Big Squaw and A–I are common practice in the insurance industry. *In re Redfeather Fast Freight, Inc.,* 1 B.R. 446, 449 (Bankr.D.Neb.1979). Other courts have explained them and have upheld their validity. *E.g., Baker & Co., Florida v. Preferred Risk Mut. Ins. Co.,* 569 F.2d 1347, 1348 (5th Cir.1978); *In re Auto-Train Corp.,* 9 B.R. 159 (Bankr.D.D.C. 1981). Moreover, bankruptcy courts have often had occasion to address the status of premium financing agreements under the Code and the U.C.C. *See In re U.S. Repeating Arms Co.,* 67 B.R. 990, 996 (Bankr.D.Conn.1986) (collecting cases).

Application of U.C.C. § 9–104(g) has been made not only to determine whether an unearned premium assignment transaction is covered or not covered by the U.C.C., *e.g., In re U.S. Repeating Arms Co., supra; In re Duke Roofing,* 47 B.R. 990, 994 (Bankr.E.D.Mich.1985); but also to determine the scope of secured claims based solely upon a security interest cre-

---

**13.** *See* Restatement (Second) of Conflict of Laws § 187(2) (1971) which provides that, where the parties have expressed a desire for terms of contractual relationship to be governed by the law of a given state, that choice will be undisturbed so long as the state whose laws are chosen is not without a substantial relation to the transaction. In the absence of agreement by the parties, Maine's choice of law rules would direct the court to Maine law, as well. *See Baybutt Constr. Corp. v. Commercial Union Ins. Co.,* 455 A.2d 914, 917–19 (Me.1983), *overruled on other grounds, Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 385–86 (Me.1989). Although *Peerless* overruled *Baybutt* with regard to construction of certain insurance policy exclusions as a matter of Maine law, the *Peerless* opinion left undisturbed *Baybutt's* choice of law analysis, which adopted the approach of the Restatement (2nd) of Conflict of Laws § 188 (1971). Following the Restatement, the court held that the local law of the state which, with respect to the particular issue, has the most significant relationship to the transaction and the parties applies. *Baybutt supra* 455 A.2d at 918. The parties have agreed that, although A–I is a New York corporation, it negotiated the premium financing agreement with Big Squaw, a Maine corporation with its principal place of business in Maine, through a Maine insurance agent. A–I has further conceded the ultimate issue by stipulating to the application of Maine law. Finally, were the transaction within the U.C.C., Maine law would apply, as well. § 9–103(1), (6).

**14.** The Uniform Commercial Code is enacted as Title 11 to the Maine Revised Statutes Annotated. U.C.C. § 9–104 appears as 11 M.R.S.A. § 9–104.

**15.** As enacted at 11 M.R.S.A. 9–104, the exclusion provides, in pertinent part:

This Article does not apply
(7) To a transfer of an interest or claim in or under any policy of insurance, except as provided with respect to proceeds, Section 9–306, and priorities in proceeds, Section 9–312....

**16.** 8 R. Anderson, *On The Uniform Commercial Code,* §§ 9–104:4, 9–104:5 and 9–104:6 (1985 & Supp.1989).

**17.** *See, e.g.,* 11 M.R.S.A. §§ 9–203, 9–302.

ated and perfected under the U.C.C.'s provisions, *In re Fount–Wip Distributors of South Jersey, Inc.*, 4 B.R. 424, 425 (Bankr. D.N.J.1980). Virtually all of the cases that have addressed the issue have concluded that a premium financing entity's right to unearned premium refunds on cancellation are excluded from the U.C.C.'s rules by § 9–104(g). *In re U.S. Repeating Arms Co. supra* at 996.

The trustee argues that, as an exclusion, U.C.C. § 9–104(g) must be construed narrowly. *In re Maplewood Poultry, supra,* 2 B.R. at 555. The trustee urges that this case can be distinguished from *Maplewood Poultry* because the policies at issue were cancelled before the case was commenced and, as a result, at the time that the estate was created, the encumbered funds at issue were simply money held by Chalmers. Were that the case, the court might be more receptive to the trustee's argument that, just as all good things end, the protection afforded A–I by U.C.C. 9–104(g)'s exclusion had come to an end before the case was commenced.[18] However, the legal and factual premises of the Trustee's argument are flawed.

As noted above,[19] although the policies were cancelled and the premiums refunded before the order for relief was entered, cancellation and refund occurred on and after March 31, 1990, well after the March 17 filing of the petition. The case was commenced when the petition was filed, not when the order for relief was entered. Code § 303(b). As of that date, A–I's right was to a refund of unearned premiums upon termination of Big Squaw's policy. Thus, although *Maplewood Poultry* and other cases address the right of an entity providing premium financing to obtain re-

lief from the stay to cancel policies and obtain premium refunds or, alternatively, to adequate protection,[20] the distinction is here without difference. At the critical point of inquiry, A–I's rights as an assignee of unearned premiums constituted a claim "in or under [a] policy of insurance" and, therefore, excluded from the U.C.C.'s coverage by § 9–104(g).

### 4. *A–I's Rights Under the Common Law.*

■ In light of the U.C.C. exclusion, the relative rights of the trustee and A–I in unearned premiums must be determined under Maine common law governing the enforceability of a pledge of intangibles against third parties. *See Maplewood Poultry, supra,* 2 B.R. at 554 n. 5. In this instance, it is tested against the rights of the bankruptcy trustee, enriched with his statutory strongarm powers. Thus, the question to be addressed is whether, as of the date the case was commenced, March 17, 1990, A–I had "perfected" its lien in unearned premiums sufficiently to defeat the claims of a judicial lien creditor who obtained its lien on that date. Code § 544(a).

As of the date of commencement, the policies remained in force, A–I held the premium financing agreement that created the lien and forbade assignment of the policies, and that A–I did not have possession of the policies themselves. The policies did not expressly refer to the assignment of unearned premiums. A–I had, however, served each insurance carrier with a notice informing them of the assignment at the time it was made.

At common law, a party claiming a lien by chattel mortgage could protect its inter-

---

**18.** Certainly, at some point after unearned premiums are refunded, the exclusion will cease to operate. Competing claims will relate only to a fund of money, rather than to rights under policies of insurance. Even if that were the case, however, the trustee would be forced to overcome the fact that the funds were in the possession of A–I's agent, Chalmers. Under the U.C.C., with the funds paid over to the secured creditor, through its agent, perfection would be complete. 11 M.R.S.A. § 9–305. *Cf. In re Van Kylen,* 98 B.R. 455, 467 (Bankr.W.D.Wis.1989)

(discussing possession through agent for purposes of perfection).

**19.** *See supra* note 6.

**20.** *See, e.g., In re U.S. Repeating Arms Co., supra* (relief from stay); *In re RBS Industries, Inc.,* 67 B.R. 946 (Bankr.D.Conn.1986) (adequate protection); *Premium Financing Specialists, Inc. v. Lindsey,* 11 B.R. 135 (Bankr.E.D.Ark.1981) (relief from stay); *In re Maplewood Poultry Co., Inc., supra* (relief from stay).

est by taking possession of its collateral. *See Production Credit Assoc. v. Kent*, 143 Me. 145, 148, 56 A.2d 631, 633 (1984); *Peaks v. Smith*, 104 Me. 315, 317–18, 71 A. 884 (1908). In Maine, the common law was supplemented by legislation, which provided that chattel mortgagees could perfect their interests by filing a notice in the proper public office as an alternative to taking possession. *Peaks v. Smith, supra*, 104 Me. at 318, 71 A. 884. In recognizing possession as a means of establishing the lienor's rights, the statute merely restated the common law; in providing for perfection by recordation, the statute created an alternative route to the same end. *Id.* Both methods were gauged to provide notice to third parties.

The purpose of taking possession and retaining it, or of recording, is to give notice to creditors and subsequent purchasers. "The clause of the statute relating to possession is simply declaratory of the common law, while that relating to record provides an equivalent therefore not previously authorized. The mortgagee is given his option either to take and keep possession, or to record the mortgage. The two methods are distinct. One or the other is indispensable as against third parties." *Peaks v. Smith*, 104 Me. 315, 71 A. 884.

*Production Credit Assoc. v. Kent, supra*, 143 Me. at 148, 56 A.2d 631.

A–I asserts that its retained possession of the financing agreement, coupled with the notice it served upon the insurance carriers, suffices for purposes of perfection at common law. It argues that *Maplewood Poultry's* dictum establishes that, given the impossibility of obtaining possession of an intangible such as an unearned premium, possession of the "evidence of the pledge", *i.e.* the financing agreement, will suffice. 2 B.R. at 554 n. 5. However, in *Maplewood* the creditor retained the financing agreement *and* the policies provided notice of the assignment. *Maplewood's* dictum, stressing the ascendant public policy to provide notice embodied in the U.C.C.[21] would appear to make this distinction important.[22]

With regard to policies of insurance, it has been held that physical delivery of a policy, intended as a pledge for security on a debt, creates a lien in favor of the pledgee superior to the rights of a third party who is subsequently designated as beneficiary of the policy.[23] However, to say that a valid pledge of the policy and its proceeds can be created by delivery is not to say that a valid assignment for security of unearned premiums must be so accomplished. Indeed, Judge Cyr observed in *Maplewood* that premium financing agreements present issues of perfection that are distinct from those presented by a pledge of the policy itself:

A pledge of insurance policies requires that the pledgee maintain physical possession of the policies. Here, the collateral is not the insurance policies themselves, but the unearned premiums, a general intangible. The perfection of a pledge of intangibles under the common law required possession by the pledgee of the evidence of the pledge itself. Since Thico retained possession of the premium finance agreement under which the security interest in unearned premiums was created, it would appear that sufficient compliance was had with the

---

21. *In re Maplewood Poultry, supra*, 2 B.R. at 555 (noting fundamental U.C.C. policy to discourage secret liens and observing that notice of premium assignment in the policies themselves precluded the possibility of transfer of policies to third parties without providing them with notice of finance company's interest.) That assignment of the policy or of an interest in unearned premiums would have constituted a breach of contract between A–I and Big Squaw does not operate to inform third parties of A–I's lien.

22. Certainly, were we considering an attempted transfer for security of a negotiable instrument by a separate writing, unaccompanied by delivery of the instrument itself, the opportunity for mischief would exist, and the transfer would not be effective against third parties. *See*, 11 M.R.S.A. § 9–304(1). *See generally* 1 G. Gilmore, Security Interests in Personal Property § 1.2 1965).

23. *In re Bickford's Estate*, 265 A.D. 266, 38 N.Y. S.2d 785 (1942). *See* Annot., 53 A.L.R.2d 1396, 1399 (1957).

pledge perfection requirements of the Maine common law.

2 B.R. at 554 n. 5.

Beyond *Maplewood's* teaching, there is little guidance in the Maine cases.[24] Although we know that perfection of an assignment for security of unearned insurance premiums need not be perfected by filing under Maine's version of U.C.C.,[25] and although the provisions of Maine's Consumer Credit Code regulate the business of premium financing and the rates charged for such credit,[26] Maine statutes contain no regulation of the manner in which assignments of unearned insurance premiums pursuant to premium financing agreements must be perfected, if at all.[27]

The law of other jurisdictions is instructive. Generally, those that have addressed the issue by legislation have enacted statutes expressly providing that no filing of a premium financing agreement is necessary to protect the rights of the assignee against claims of creditors, subsequent purchasers, pledgees or encumbrancers. *In re RBS Industries, Inc., supra,* 67 B.R. at 949 (citing New York statute); *In re U.S. Repeating Arms, supra,* 67 B.R. at 997 (applying Maryland statute and discussing Connecticut statute in dictum); *In re Auto–Train Corp., supra,* 9 B.R. at 164–65 (applying D.C.Code); *In re Redfeather Fast Freight, supra,* 1 B.R. at 450–51 (applying New York statute). *See also* Cal.Fin.Code § 18591; Kan.Stat.Ann.

§ 40–2613 (1988); N.H.Rev.Stat.Ann. 415–B:11 (1989).[28]

In the absence of legislation, the courts have held that, under the common law, neither recordation of the premium financing agreement or taking possession of the underlying policy is required to perfect the insurance premium assignee's interest. In *In re Expressco, Inc.,* 99 B.R. 395, 396 (Bankr.M.D.Tenn.1989), the district court applied Tennessee law, which included the U.C.C. exclusion, but no other statute relating to the validity of unearned premium assignments. It held that under applicable common law principles, assignment of an interest in unearned premiums would be valid against third parties if the assignee could demonstrate that notice had been given to the party obligated to make the refund, *i.e.* the insurer. In *Premium Financing Specialists v. Lindsey, supra,* the court applied Arkansas common law, albeit in a different factual context, and concluded that a premium financing agreement was valid against the claims of a subsequent assignee of the entire policy to create an equitable lien in favor of the financing entity for the amount of its advances and that, in the absence of law requiring it, the assignment was good as against third parties without filing or delivery of the policy. 11 B.R. at 137–138.[29]

In light of A–I's possession of the financing agreement and its notification of the insurance carriers, this court concludes that filing a notice of the assignment or

---

**24.** The Maine cases speak in general terms, but do not directly address the issue. *Production Credit Association v. Kent, supra,* discussed a chattel mortgage in potato crops and the priority rights of a mortgagee against a subsequent attachment lienor who extended credit to the mortgagor before the mortgage was tardily recorded. 143 Me. at 148–149, 56 A.2d 631. *Peaks v. Smith, supra,* declared that a chattel mortgage that has neither been recorded nor perfected by possession cannot maintain priority over a subsequent attachment. 104 Me. at 319–320, 71 A. 884. *Shaw v. Wilshire,* 65 Me. 485 (1876), discussed the necessity of perfecting a chattel mortgage by chattel mortgagee by taking possession or by recordation, as well.

**25.** *See discussion supra.*

**26.** *See* 9–A M.R.S.A. §§ 2–302, 2–401.

**27.** Maine enacted and repealed versions of an Insurance Premium Financing Act on two occasions. Me.Laws 1973 c. 490, repealed by Me. Laws 1973 c. 762 § 2 (*eff.* Jan. 1, 1975); reenacted by Me. Laws 1975 c. 429, (*eff.* Jan. 1, 1976), repealed by Me.Laws 1985, c. 763 § A, 14 (*eff.* Jan. 1, 1986). At no time did the legislation address or prescribe a means for perfection of rights in unearned premiums.

**28.** *Cf.,* Alaska Stat. § 6.40.150 (Michie 1990) (providing that, upon cancellation, insurer shall pay unearned premiums to assignee, if the insurer has been given notice of the assignment.

**29.** *See also In re Redfeather Fast Freight, Inc., supra* 1 B.R. at 450–51 (no filing necessary under Nebraska common law) (dictum).

taking possession of the insurance policies themselves was unnecessary under Maine's common law and that A–I's interest stands valid against subsequent encumbrancers, including the bankruptcy trustee.

Although third parties dealing with the insured may not be aware of such an assignment from the face of the insurance policies, the drafters of the U.C.C. considered the area involving claims to and under insurance policies to be sufficiently distinct and well regulated to warrant their exclusion from Article 9's filing requirements.[30]  The U.C.C. exclusion serves to alert all parties that rights and claims under insurance policies, including rights in unearned premiums, are matters sufficiently unique to require diligent inquiry before advancing credit with the expectation that they may be made to serve as reliable security.

### Conclusion

For the reasons set forth above, judgment in favor of A–I, and against the trustee, will be entered by separate order.

---

30.  The parties have introduced no evidence that, aside from premium financing agreements, there exists any commercial traffic in interests in unearned premiums that would warrant imposition of a filing requirement or a broader notice than A–I accomplished here as a matter of common law.