In re U.S. REPEATING ARMS COMPANY, a/k/a Repeating Arms Company, Debtor.

TIFCO, INC., Movant,

v.

U.S. REPEATING ARMS COMPANY, a/k/a Repeating Arms Company, Respondent.

Bankruptcy No. 5–86–00036.
Motion No. 5–86–0041–M.

United States Bankruptcy Court,
D. Connecticut.

Dec. 22, 1986.

Barbara Hadley Katz, DiPietro, Kantrovitz & Brownstein, New Haven, Conn., for debtor.

James J. Tancredi, Day, Berry & Howard, Hartford, Conn., for movant.

Robert U. Sattin, Paula T. Yellman, Reid & Reige, Hartford, Conn., for Official Creditors' Committee.

Brian E. Kriger, Shea & Gould, New York City, N.Y., for Manufacturers Hanover Commercial Corp.

## MEMORANDUM OF DECISION AND ORDER ON MOTION FOR RELIEF FROM AUTOMATIC STAY UNDER CODE SECTION 362(a)

ALAN H.W. SHIFF, Bankruptcy Judge.

Tifco, Inc. ("TIFCO"), an insurance premium finance company, has filed a motion seeking relief from the automatic stay provided by 11 U.S.C. § 362(a) in order to enforce its rights as a secured creditor pursuant to the Premium Finance Agreements it entered into with the debtor, U.S. Repeating Arms Company ("USRAC"). Specifically, the relief sought by TIFCO, would include, but not be limited to "the right to cancel the Debtor's insurance ... and to recover, receive and collect any and all unearned ... premiums as a result of such cancellation." Although the terms of the policies in which TIFCO has claimed its interest have expired, TIFCO asserts that, pursuant to 11 U.S.C. § 361, it is entitled to adequate protection of the value of its collateral as of the date USRAC filed its Chapter 11 petition. TIFCO's claim to a valid, perfected and enforceable lien upon USRAC's unearned insurance premiums is contested by USRAC, the Official Unsecured Creditors' Committee ("committee"), and Manufacturers Hanover Commercial Corporation ("MHCC"), a secured creditor. USRAC and the committee further contend that in the event TIFCO is found to be a secured creditor with an enforceable lien, its interest is adequately protected by an $81,000.00 escrow account established by USRAC during the pendency of this motion.

The parties have stipulated and this court finds as follows: [1]

1. TIFCO, INC. ("TIFCO") is a Maryland corporation having its home office and principal place of business located at 658 Kenilworth Drive, Towson, Maryland.

2. TIFCO is a duly licensed insurance premium finance company whose principal business is the lending of monies, pursuant to premium finance agreements, to consumer and commercial insureds so as to enable such insureds to prepay premiums for insurance policies issued through insurance brokers.

3. United States Repeating Arms Co. (USRAC) is a Connecticut corporation

---

1. Stipulation of the parties filed June 13, 1986.

with its principal place of business located at 275 Winchester Avenue, New Haven, Connecticut.

4. USRAC is a manufacturing company principally engaged in the production of light fire arms bearing the Winchester trademark.

5. On January 16, 1986, USRAC filed with the United States Bankruptcy Court, District of Connecticut, a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code.

6. USRAC is currently the Debtor and Debtor-in-Possession in this case and continues to operate the business and manage the properties of the bankruptcy estate pursuant to 11 U.S.C. §§ 1107 and 1108.

7. Alexander & Alexander, Inc. ("A & A") is a duly licensed insurance broker who from its office in New York, New York advised USRAC as to its insurance needs, brokered the subject policies and acted as "Producer" and insurance agent on the financing of such policies.

8. On or about September 9, 1985, US-RAC executed a document entitled Premium Finance Agreement (Exhibit A) pursuant to which it agreed, *inter alia,* in consideration of premium payments to be made by TIFCO for nine insurance policies listed thereon, to pay to TIFCO, or its order, the amounts financed by TIFCO ($436,-490.00) plus appropriate finance charges ($19,451.44), for a total indebtedness of $455,941.44.

9. Under the terms of the September 9, 1985 Premium Finance Agreement, USRAC agreed to pay 8 equal installments of $56,992.68 to TIFCO on the 20th day of each month commencing September 20, 1985.

10. On November 18, 1985, USRAC executed another document entitled Premium Finance Agreement (Exhibit B) pursuant to which it agreed, *inter alia,* in consideration of premium payments to be made by TIFCO to

Columbia Casualty Company, to pay to TIFCO, or its order, the amounts financed by TIFCO ($117,217.00) plus appropriate finance charges ($3,465.60), for a total indebtedness of $120,682.60.

11. Under the terms of the November 18, 1985 Premium Finance Agreement, USRAC agreed to pay 5 equal installments of $24,136.52 to TIFCO on the 20th day of each month commencing December 20, 1985.

12. Pursuant to the Premium Finance Agreements, USRAC assigned to TIFCO an interest in the unearned or returned premiums on the insurance policies purchased through A & A.

13. Pursuant to the Premium Finance Agreements, USRAC appointed TIFCO as its attorney-in-fact to cancel any or all of the policies financed and to receive any unearned or returned premiums and to either endorse any check or draft in the insured's name or to direct the insurance companies to make the check or draft payable to TIFCO.

14. A & A, as the authorized policy issuing agent of the insurance companies listed in the Premium Finance Agreements, was party to and had notice of the terms and conditions of said Agreements.

15. TIFCO has duly issued notice of its interest under the Premium Finance Agreements through the mailing of the attached Advices of Financed Premiums (Exhibit C) to the issuing insurance companies and the Producers thereof.

16. No Uniform Commercial Code Financing Statement has been filed by TIFCO in connection with the US-RAC financing, as is its customary business practice in similar financing arrangements.

17. A & A, as insurance broker, arranged USRAC's premium financing by TIFCO, as is normal and custom-

ary in the brokerage of commercial insurance coverage.

18. The Premium Finance Agreements, by their terms, state that they took effect upon TIFCO's approval of the financing arrangement at its office in Towson, Maryland. TIFCO issued payment to USRAC's insurance premiums due to those companies scheduled in the Premium Finance Agreements from its Maryland office.

19. The insurance coverage financed by TIFCO on behalf of USRAC covers a substantial range of business insurances which are necessary, required or prudent in the Debtor's business.

20. The major portion of the Debtor's assets and business operations covered by the subject insurance policies are located in New Haven, Connecticut.

21. As of the date of the filing of the petition herein, exclusive of down payments for the purchase of insurance policies, the Debtor paid $276,-243.76 to TIFCO for premiums financed under the Agreements and has made no payments thereafter.

22. USRAC has not made the installment payments due on January 20 ($56,-992.68) and February 20, 1986 ($81,-129.20) under the Agreements in the total amount of $138,121.88.

23. Under the terms of the Premium Finance Agreements an additional $81,-129.20 was due to TIFCO on March 20 and April 20, 1986 and has not been paid.

24. The remaining balance currently due and owed by USRAC to TIFCO, under the Premium Finance Agreements, is $300,380.28.

25. As of the date of USRAC's filing its petition herein, the amount of the unearned premiums herein exceeded USRAC's debt to TIFCO by $114,-105.48.

26. The value of the unearned insurance premiums has diminished at the approximate rate of 1% of the original policy premiums every 5 days as the insurance premiums become earned.

27. USRAC has not, during the pendency of this case, made periodic payments to TIFCO equal to the rate at which the premiums become earned under the subject insurance policies.

28. As of May 10, 1986, the amount of the unearned insurance premiums herein was $172,523.17.

29. If TIFCO's lien is valid, perfected and enforceable, USRAC has no equity in the unearned insurance premiums financed by TIFCO.

30. On July 16, 1981, USRAC entered into an agreement entitled Security and Loan Agreement (Exhibit D) with Manufacturers Hanover Commercial Corporation ("MHCC").

31. By the terms of such agreement, USRAC granted to MHCC, among other things, a continuing assignment and security interest in all its existing and future contract rights, general intangibles, insurance policies and all rights to the goods represented by the foregoing and all cash and non-cash proceeds thereof.

32. MHCC has filed financing statements, more than 90 days prior to the filing of USRAC's Chapter 11 case, which statements note its interests in USRAC's assets, with the Secretary of State for Connecticut and Clerk of City of New Haven, Connecticut and Secretary State of Massachusetts and Clerk of Town of Hingham and City of Plymouth, Massachusetts (Exhibits E & F).

33. During the pendency of this case, the United States Bankruptcy Court has authorized USRAC to continue its July 16, 1981 agreements with MHCC to borrow money from time to time from MHCC until July 31, 1986 and to enter into a new Accounts Receivable Financing Agreement secured by a security interest on all of USRAC's property, now existing or hereafter created or acquired, wherever located, subject only to valid

and perfected unavoidable liens and security interests existing in the collateral at the time of the filing of the petition commencing this Chapter 11 case. (Judicial Notice of USRAC Financing Applications and Orders).

34. On February 13, 1986, USRAC entered into said new Accounts Receivable Financing Agreement with MHCC.

## DISCUSSION

## I.

### CHOICE OF LAW

■ When confronted with legal issues arising from a multi-state transaction, such as the matter before the court, the initial inquiry must concern which law to apply, and, in undertaking that analysis, it is well settled that federal courts must apply the substantive conflict of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Under the applicable Connecticut choice of law rules for contract actions, Connecticut courts look to the place of execution of the contract, but if the operative effect of performance is in a state different from the state of execution, the court will look to the law of the state where the operative effect or performance will occur. *See Arditi v. Dubitzky,* 354 F.2d 483, 485 (2d Cir.1965); *Masarjian v. Mark Lighting Fixtures Co., Inc.,* 595 F.Supp. 869, 870 (D.Conn.1984). Here, the insurance premium financing agreements were accepted and became operative in Maryland where TIFCO approved them and performed by making payments directly to USRAC's insurers. TIFCO and USRAC agree that Maryland law supplies the rule of decision.[2] Moreover, neither party contends that applying Connecticut law would produce a different result. Accordingly, the court will apply Maryland law.

2. TIFCO's Brief at 18; USRAC's Brief at 10.

## II.

## VALIDITY, PERFECTION AND ENFORCEABILITY OF TIFCO'S ASSERTED SECURITY INTEREST

### A.

#### Validity

This court, in *In re RBS Industries, Inc.,* 67 B.R. 946 (1986), and others which have considered premium finance agreements such as those at issue here, have recognized that the financier may be a secured creditor of the insured. *In re Duke Roofing Co., Inc.,* 47 B.R. 990, 994 (E.D.Mich.1985); *Premium Financing Specialists, Inc. v. Lindsey,* 11 B.R. 135, 138 (E.D.Ark.1981); *In re Air Vermont, Inc.,* 40 B.R. 335, 337 (Bankr. D.Vt.1984); *In re Auto-Train Corp.,* 9 B.R. 159, 164–65 (Bankr.D.D.C.1981); *In re Krimbel Trucking Co., Inc.,* 3 B.R. 4, 6 (Bankr.W.D.Wash.1979); *Matter of Maplewood Poultry Co.,* 2 B.R. 550, 553 (Bankr. D.Me.1980); *Matter of Redfeather Fast Freight, Inc.,* 1 B.R. 446, 450 (Bankr.D. Neb.1979).

The premium finance agreement executed by USRAC on November 18, 1985, specifically granted TIFCO a security interest in any unearned premiums on insurance policies financed by TIFCO. (Stipulation, Exhibit B) The September 9, 1985 finance agreement, however, is silent as to such a grant. (Stipulation, Exhibit A) While it is true that what parties say is useful in determining their intent, what the parties do is more significant. Here, in performance of its duties under each of those agreements, USRAC assigned to TIFCO its interest in unearned premiums and appointed TIFCO its attorney-in-fact to cancel the policies in the event USRAC defaulted on its obligation to pay TIFCO for financing the premiums. (Stipulation, Exhibits A and B)

The presence of a specific grant of a security interest in the November agreement and the absence of such a grant in the September agreement is a difference

without a distinction. It is clear that the parties intended both agreements to follow the typical arrangements in insurance premium finance agreements. Premium financing is a common practice in the insurance industry involving

'an advance by the finance company to the insurance company or its agent of the premium due for the full term of the policy. This advance is then repaid by the insured to the finance company in amortized monthly installments which includes an additional amount to cover financing charges. The finance company is secured in making this advance by obtaining the right to cancel the policy and to receive the return premium due upon cancellation if timely repayments are not made.'

*Matter of Redfeather Fast Freight, Inc.,* supra, 1 B.R. at 449–450, quoting *Baker & Co. v. Preferred Risk Mutual Insurance Co.,* 569 F.2d 1347, 1348 (5th Cir.1978).

As the *Redfeather* court observed, a security interest in unearned premiums is created when the premium finance company makes full payment of the premiums due, and in return, through an assignment effective under state law, receives the right to any unearned premiums following the default of the insured. *Matter of Redfeather Fast Freight, Inc., supra,* 1 B.R. at 450. As in *Redfeather,* TIFCO paid US-RAC's premiums in full and received an assignment, effective under Maryland law, of the right to all unearned premiums. *See Michigan Fire & Marine Insurance Co. v. Genie Craft Corp.,* 183 F.Supp. 533 (D.Md. 1960) (rights in insurance policies are assignable); *see also* Md.Ann.Code Art. 48A § 486A(a).

Although the September 9, 1985 premium finance agreement is silent as to specific language granting TIFCO a security interest in unearned premiums, the intent of the parties to create such an interest is manifest in the terms of that agreement

and the action taken by the parties in performance thereof. I accordingly conclude that TIFCO had a security interest in unearned premiums under both the September and November, 1985 agreements.

### B.

### Perfection

TIFCO concedes that its security interest is not perfected if the premium financing agreements are subject to Article 9 of the Uniform Commercial Code as adopted in Maryland. Md.Com.Law Code Ann., § 9–101, et seq. TIFCO contends, however, that premium financing agreements are specifically excluded from the scope of Article 9. The 1972 text of U.C.C. § 9–104(g), adopted in Maryland,[3] provides:

This Article does not apply ...

(g) to a transfer of an interest in or claim in or under any policy of insurance, except as provided with respect to proceeds (Section 9–306) and priorities in proceeds (Section 9–312) ...

USRAC and the other parties dispute TIFCO's assertion that unearned insurance premiums represent an "interest in or claim in or under" an insurance policy outside the scope of Article 9 and argue that the § 9–104(g) exception is limited to situations where the policy itself, rather than unearned premium refunds from cancelled policies, is the collateral involved.[4] To support their position they rely upon *PPG Industries, Inc. v. Hartford Fire Insurance Co.,* 531 F.2d 58 (2d Cir.1976) (in which the court of appeals stated that the "exclusion applies only to situations where the parties to a security agreement attempt to create a direct security interest in an insurance policy by making the policy itself the immediate collateral securing the transaction"). *Id.* at 60. *See also Paskow v. Calvert Fire Insurance Co.,* 579 F.2d 949, 953 (5th Cir.1978); *Ettinger v. Central Penn National Bank,* 2 B.R. 385 (E.D.Pa.

---

**3.** Connecticut also has enacted the 1972 version of U.C.C. § 9–104(g) which expanded the coverage of Article 9 to certain insurance money as proceeds. U.C.C. § 9–104(g), Comment 7.

**4.** USRAC's Brief at 5–7; Creditors' Committee Brief at 10; MHCC's Brief at 17.

1979), *rev'd on other grounds,* 634 F.2d 120 (3d Cir.1980).

Although § 9–104(g) exclusions should be narrowly construed, *see In re Maplewood Poultry Co., supra,* 2 B.R. at 555, the decisions cited by the parties opposing TIFCO are inapposite in that those courts merely recognized the need for a U.C.C. filing to protect an interest in the *proceeds* of insurance policies paid upon loss or damage to collateral[5] and cannot be read so broadly as to bring insurance premium financing transactions within the scope of Article 9 by including unearned premiums within the proceeds exception of § 9–104(g).[6] *See PPG Industries v. Hartford Fire Insurance Co., supra,* 531 F.2d at 60; *Paskow v. Calvert Fire Insurance Co., supra,* 579 F.2d at 953. Bankruptcy courts, including this court, which have previously considered this issue, have held unanimously that Article 9 of the U.C.C. is not applicable to a security interest in unearned insurance premiums. *See In re RBS, Industries, Inc., supra* (applying New York law); *In re Duke Roofing Co., supra,* 47 B.R. at 992 (applying Michigan law); *Premium Financing Specialists, Inc. v. Lindsey, supra,* 11 B.R. at 138 (applying Arkansas law); *In re Air Vermont, supra,* 40 B.R. at 337 (applying Vermont law); *In re Auto-Train Corp., supra,* 9 B.R. at 164–65 (applying District of Columbia law); *In re Krimbel Trucking Co., Inc., supra,* 3 B.R. at 6 (applying Washington law); *Matter of Maplewood Poultry Co., supra,* 2 B.R. at 554 (applying New Jersey law); *Matter of Redfeather Fast Freight, Inc., supra,* 1 B.R. at 450 (applying Nebraska and New York law).

The interest granted TIFCO was a direct "interest in" the policies themselves, not the proceeds therefrom. As the court stated in *In re Auto Train Corporation, supra,* 9 B.R. at 164–65:

> While this right or security interest might generally be looked upon as a "refund of an overpayment", it arises under the insurance policy and is intimately linked to the unearned premiums. Accordingly, the "refund" is not a vague or abstract contract right, but is in reality a rebate arising from the unearned insurance premiums under each of the designated policies. The generalized concept of "refund", as argued by the Trustee, cannot exist in a conceptual vacuum—it, must, of necessity relate to a specific and underlying contract—in this case, a contract of insurance. Because of this necessary relationship, it is clearly a right arising *in or under* a policy of insurance. (Emphasis in original).

Notwithstanding the § 9–104(g) exception, MHCC argues that TIFCO's security interest is unperfected by operation § 9–203(4).[7] I do not agree. U.C.C. § 9–203(4) is a general provision which cannot be read as recapturing transactions expressly excluded from the scope of Article 9 by specific statutory language. As the draftmen noted in explaining the official text of U.C.C. § 9–203(4), Article 9 "is designed to

---

**5.** *PPG* and *Ettinger* were decided under the 1964 version of U.C.C. § 9–306(1), which provided that:

> "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds." All other proceeds are "non-cash proceeds."

The relevant statute in *Paskow* was the 1966 version of § 9–306(1) which is identical to the 1964 enactment. The 1972 amendment to § 9–306 specifically requires that a financial statement be properly filed to perfect an interest in insurance proceeds.

**6.** The parties agree that the unearned premiums in which TIFCO claims its security interest are not "proceeds" as that term is defined in U.C.C. 9–306(1), *see* TIFCO Brief at 15; Official Unsecured Creditors' Committee Brief at 15–6. MHCC Brief at 33–4. *Accord* USRAC's Brief at 7–8.

**7.** Md.Com.Law Code Ann. § 9–203(4) (Supp. 1986) provides in pertinent part that:

> A transaction, although subject to this title, may also be subject to other statutes regulating loans and retail installment sales, such as ... [not including premium financing agreements], and in the case of conflict between the provisions of this title and any such statutes, the provisions of such statute control.

regulate all the 'security' aspects of transactions *within* its scope" (emphasis added). It does not, as MHCC contends, bring back within the scope of the Article those transactions specifically excluded by express language.

■ Since Article 9, as adopted by Maryland, does not apply to the perfection of insurance premium financing, Maryland law must be analyzed to determine whether there is any requirement regarding the perfection of security interests created by such agreements. A review of that state's law discloses that Maryland only requires that a copy of the financing agreement be furnished to each insurer issuing a policy, Md.Ann.Code Art. 48A § 486B(2)(e),[8] and it is undisputed that TIFCO furnished a copy of the premium financing agreements to each insurer which issued a policy financed by TIFCO.

In the absence of an express statutory provision requiring filing, the filing of assignments is unnecessary, *see* 6 Am.Jur.2d § 95 *Assignments* (1963), *accord Premium Financing Specialists, Inc. v. Lindsey, supra,* 11 B.R. at 138, and the security interest which USRAC granted TIFCO through the assignments is therefore perfected under Maryland law.[9]

## C.

### Prepetition Property

■ The objecting parties argue that even if TIFCO has a perfected security interest under state law, that interest is unenforceable under bankruptcy law. In essence, they contend that unearned premiums could only come into existence after the cancellation of the insurance policies, and since the policies were not cancelled prior to the commencement of this case, any unearned premiums would be after-ac-

quired property of the bankruptcy estate, which under Code § 552 is not subject to TIFCO's prepetition security interest.

As this court concluded in *In re RBS, Industries, Inc., supra,* unearned premiums are not after acquired property. Cancellation is merely a procedural device through which the parties intend to provide the premium financier with recourse to the collateral securing its loan; it does not operate to create the collateral.

## D.

### Priority

■ MHCC and USRAC further assert that whether or not TIFCO has a perfected security interest, the security interest USRAC granted MHCC in all existing and future contracts, general intangibles, insurance policies and all rights to the goods represented by the foregoing and all cash and non-cash proceeds [10] was duly perfected prior to TIFCO's lien, and is therefore superior in right to TIFCO's claim. However, the reliance upon the priority rule "first in time is first in right" as stated in *United States v. City of New Britain,* 347 U.S. 81, 84–85, 74 S.Ct. 367, 369–70, 98 L.Ed. 520 (1954) is misplaced since that principle is applicable only when competing liens are of the same nature. TIFCO was granted its lien in specific unearned premiums by USRAC as security for the direct payments of premiums made by TIFCO to USRAC's insurers. The new value given by TIFCO was precisely the value which enabled USRAC to purchase coverage under the policies issued, and TIFCO gave USRAC's insurers notice of the interest in the policies which USRAC had assigned to it. The lien therefore has the character of a perfected, purchase money security interest, *see Anderson Bros. Ford v. Valencia,*

---

**8.** Md.Ann.Code art. 48A § 486B(2)(e) provides that:

A copy of each premium finance agreement or other notice thereof describing the policy or policies involved must be given the agency issuing the policy or policies or the insurers involved.

**9.** Since Connecticut law, Conn.Gen.Stat. § 38–290 et seq., contains no statutory provision requiring recording or filing to perfect a security interest in unearned insurance premiums, the same result would be reached if Connecticut law were applied in this proceeding.

**10.** Stipulation ¶¶ 30 and 31.

452 U.S. 205, 215, 101 S.Ct. 2266, 2271, 68 L.Ed.2d 783 (1981), a type of interest long given priority over liens attaching through "after-acquired property" clauses. *See* 1B Coogan, Hogan, Vagts, *Secured Transactions Under the Uniform Commercial Code,* § 19.01 at 19–3–4 (1986); White & Summers, *Uniform Commercial Code,* § 25–5 at 1043 (2d ed. 1980). *Cf.* U.C.C. §§ 9–107, 9–312(4). I accordingly conclude that TIFCO's lien is perfected and that its security interest in the unearned premiums is superior to that asserted by MHCC.

### E.

### Irrevocable Power of Attorney

 USRAC finally contends that even if TIFCO has perfected a lien prior to that of MHCC, all power to enforce the lien was lost upon commencement of this case which revoked the power of attorney and assignment. This argument is likewise without merit. An irrevocable power of attorney is not made unenforceable in bankruptcy if coupled with an interest in the subject property superior to that of the trustee in bankruptcy. *Premium Financing Specialists, Inc. v. Lindsey, supra,* 11 B.R. at 137; *Matter of Maplewood Poultry Co., supra,* 2 B.R. at 553. TIFCO's power of attorney together with the assignment of the unearned premiums are functionally linked thereby affording TIFCO a contractual remedy with which to enforce its rights in the collateral upon USRAC's default. As the court in *Maplewood* stated:

> A security interest in unearned premiums would be worthless without the means to recover premiums, which can only be recovered upon cancellation of

the policy. It cannot reasonably be supposed that the parties intended when they entered into the agreement that the secured party be denied the means to enforce its security interest. The power to cancel was an integral component of the secured transaction, not a separate contract.

*Id.* at 553.

Thus, TIFCO's security interest in unearned premiums survived USRAC's bankruptcy and, absent the automatic stay, could be enforced following the commencement of this case. This result, as noted in *In re RBS Industries, Inc., supra,* is consistent with the broad policy goal of Chapter 11 to provide debtors with an opportunity to reorganize. To hold that unearned insurance premiums have no viability until cancellation of the policy under which they are owed, or that bankruptcy revokes the power of attorney granted by an insured in conjunction with an assignment of the insured's rights to unearned premiums would have a chilling effect on the insurance industry's willingness to enter into premium financing, which in turn would have a catastrophic effect on the reorganization efforts of financially distressed debtors.

### III.

### ADEQUATE PROTECTION

 As a duly perfected secured creditor, TIFCO is entitled to adequate protection of the value of its security interest under the Bankruptcy Code. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 207, 103 S.Ct. 2309, 2314, 76 L.Ed.2d 515 (1983); 11 U.S.C. § 361.[11] Adequate protection ensures that secured creditors re-

---

11. § 361. Adequate protection. When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
 (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
 (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
 (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

ceive the value for which they bargained,[12] *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 824–25 (Bankr.S.D.N.Y.1982); *In re Auto-Train Corp., supra,* 9 B.R. at 166, by protecting their interest in the collateral while being denied its possession by the automatic stay provisions of 11 U.S.C. § 362(a). *In re Wheeler,* 12 B.R. 908, 909 (Bankr.D.Mass.1981). Through the concept of adequate protection, the Code provides protection against the diminution in the value of collateral attributable to the stay. *In re American Mariner Industries,* 734 F.2d 426, 430 (9th Cir.1984); *In re Saypol,* 31 B.R. 796, 800 (Bankr.S.D.N.Y.1983); *In re Pine Lake Village Apartment Co., supra,* 19 B.R. at 825–26. But Code § 362(d)(1)[13] permits relief from the automatic stay for cause, including lack of adequate protection. Parties opposing a motion for relief from the stay bear the burden of proving that the secured creditor's interest is adequately protected. *See* 11 U.S.C. § 362(g)(2); *In re Thomas Parker Enterprises, Inc.,* 10 B.R. 783, 788 (Bankr. D.Conn.1981).

Congress did not establish a fixed standard of valuation to resolve disputes involving the issue of adequate protection and the legislative history of § 361 indicates that Congress intended that concept to be flexible. *See* H.R. No. 95–595, 95th Cong., 1st Sess. (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6295. As Judge Whelan stated in *In re Auto-Train Corp.:*

> [W]hile the concept of value is certainly a fluid one in bankruptcy and will be applied by the Court according to the unique circumstances of the case, the value is ultimately linked to the creditor's interest in and right to certain collateral. It, likewise, is not to be limited or restricted to a given point in time vis-a-vis the case or proceeding.... [I]f the creditor has a valid security interest ... that security interest exists throughout the case and is not "pegged" to a particular juncture of the proceeding. The proper application of adequate protection has been appropriately summarized in these words:
>
> "The most important message of the Code with respect to the treatment of entities with an interest in property of the estate is that their remedies may be suspended, even abrogated, their right of recourse to the collateral may be terminated as it is consumed in the business, but the value of their secured position *as it existed at the commencement of the case* is to be protected throughout the case when adequate protection *is required ..."* [emphasis added] 2 *Collier on Bankruptcy,* § 361.01 at 361–6 (15th ed. 1980) (emphasis in original).

*In re Auto-Train Corp., supra,* 9 B.R. at 166 (footnotes omitted).

At the time USRAC filed its Chapter 11 petition, its debt to TIFCO was $300,380.28. The value of the unearned premiums securing the loan exceeded the amount of the debt by $114,105.48.[14] On March 13, 1986, when the instant proceeding first came to trial, USRAC deposited $81,000.00 in an escrow savings account, so that in the event TIFCO succeeded in its claim, funds would be available in an amount representing the level of unearned premiums at a point in time agreed to by the parties as the earliest date TIFCO could cancel the insurance policies. Contrary to USRAC's contention, that amount was not accepted by TIFCO's counsel as the proper amount to provide TIFCO with adequate protection

---

**12.** H.R.Rep. No. 595, 95th Cong.2nd Sess. 339 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6295.

**13.** § 362. Automatic stay.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under sub-section (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; ...

**14.** Stipulation ¶¶ 24 and 25.

should its lien be found valid, and in fact it is manifestly inadequate, as it is significantly below the amount of TIFCO's security interest in the unearned premiums at the commencement of this case.

■ Since the value of TIFCO's collateral, apart from the escrow fund, has diminished to zero, granting TIFCO relief from stay will no longer suffice. Payments, either periodically or in a single cash payment, are one means of providing adequate protection to a secured creditor whose collateral is diminishing in value as a result of the stay. *See* 11 U.S.C. § 361(1); S.Rep. No. 95–989, 95th Cong., 2d Sess. 54 (1978) ("This provision is derived from *In re Bermec Corporation*, 445 F.2d 367 (2d Cir.1971), though in that case it is not clear whether the payments offered were adequate to compensate the secured creditors for their loss.") Such payments may represent the accrued amounts by which collateral has diminished in value. *See In re Auto-Train Corp., supra*, 9 B.R. at 166–67; *In re 5–Leaf Clover Corp.*, 6 B.R. 463, 466–67 (Bankr.S.D.W.Va.1983). However, this method does not foreclose other means by which a debtor may provide adequate protection, *see* 11 U.S.C. § 361(2) and (3); and it is the duty of USRAC, not this court, to propose sufficient protection to satisfy Code § 361. *See In re Auto-Train Corp., supra*, 9 B.R. at 166.

### IV

### ORDER

For the foregoing reasons, it is ORDERED that relief may enter under Code § 362(d)(1) to permit TIFCO to obtain payment of the escrow fund and it is

FURTHER ORDERED that USRAC is given 60 days from the entry of judgment in this proceeding to file and serve upon all parties in interest an offer of adequate protection sufficient to ensure the value of TIFCO's secured position as of the commencement of the case.