In re BELL FUEL CORPORATION (Jointly Administered With Triangle Petroleum Corp. Bankruptcy No. 88–12130S), Debtor.

MERIDIAN BANK, Plaintiff,

v.

BELL FUEL CORPORATION,

and

The Official Creditors' Committee of Bell Fuel Corporation, Defendants.

Bankruptcy No. 88–12129S.
Adv. No. 88–2270S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 2, 1989.
Decision Reversed May 4, 1989.

Robert A. Kargen, Richard J. Kwasny, Lesser & Kaplin, P.C., Blue Bell, Pa., Charles M. McCuen, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for Official Creditors' Committee of Bell Fuel Corp.

Marvin Krasny, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for debtor Bell Fuel Corp.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This adversary proceeding involves a contest over the ultimate right to recovery of $130,000.00 paid to the Debtor, BELL FUEL CORPORATION (hereinafter referred to as "the Debtor"), by certain insurers in settlement of a suit brought against them by the Debtor as a result of the insurers' failure to compensate the Debtor for coverage of certain "business interruption" damages. The contestants are the Plaintiff, MERIDIAN BANK (hereinafter "the Bank"), a secured creditor of the Debtor, and the intervening Defendant, THE OFFICIAL [UNSECURED] CREDITORS' COMMITTEE OF BELL FUEL CORPORATION (hereinafter "the Committee"). We conclude that the exemption of interests in a policy of insurance or in a claim arising out of a tort from Article 9 of the Uniform Commercial Code (hereinafter "UCC") prevents the Bank from extending the scope of its security interest in all of the Debtor's "general intangibles" to the funds in issue. Therefore, we rule in favor of the Committee.

The underlying Chapter 11 bankruptcy case was filed on June 16, 1988. Several days later, on June 22, 1988, the Debtor, a retailer of oil, moved for court permission to sell virtually all of its tangible assets, including the real estate upon which its facility was located. Although the Committee, as well as several individual creditors, initially objected thereto, the creditors ultimately agreed to a sale of the Debtor's assets to Atlantic Oil & Heating Company, effected by an Order of July 22, 1988, on the condition that the fully-secured Bank carve out $150,000.00 from the sale proceeds for the benefit of unsecured creditors.

At the time of the bankruptcy filing, the Debtor was also the plaintiff in a law suit instituted in July, 1985, at C.A. No. 85–2575 (E.D.Pa.), against two of its insurers. In this action, the Debtor claimed that, as a result of damages caused to its pipeline by parties engaged in construction work on property proximate to that of the Debtor in 1984, it was entitled to, *inter alia*, compensation for losses from interruption of its business due to the pipeline damage. On September 26, 1988, after notice and hearing, we approved, without objection, a settlement of this lawsuit by payment from the insurers to the Debtor of $130,000.00.

On December 6, 1988, the Bank commenced this proceeding against the Debtor to obtain a declaration from this court that it was entitled to receive the $130,000.00, as it was allegedly subject to its security interest. The Debtor, whose principal had personally guaranteed the Bank's loan and therefore stood to reduce his liability by the Bank's success in this proceeding, filed an Answer indicating no substantive opposition to the Bank's request. However, on January 4, 1989, the Committee was permitted, by stipulation with the Bank, to intervene as a defendant. As might be expected, its Answer vigorously opposed the Bank's right to receive the funds, as it claimed that the funds were an unsecured asset of the debtor's estate.

The matter was scheduled for trial on January 25, 1989. On that date, we were presented with a stipulation of counsel for the Bank and the Committee agreeing that the matter would be submitted on a Stipulation of Facts to be filed by February 1, 1989; Opening Briefs to be filed by February 15, 1989; and Reply Briefs to be filed by February 22, 1989.

Both parties scrupulously complied with this schedule. Because the factual record is contained in the Stipulation of Facts, we need make no factual findings. We are therefore able to present our Opinion in narrative form.

Although the Stipulation of Facts, being quite complete, has attached thereto all apparently-relevant documents, we need only make note of several matters contained therein to reach our disposition. First, the security interest of the Bank arises from a Security Agreement given by the Debtor in connection with a Line and Term Loan Agreement of February 25, 1985, which includes the following:

Part 6: "Collateral" as used in this Security Agreement refers to the types of property initiated by the Borrower and checked below:

(x) ACCOUNTS: Meaning all of [the Debtor's] present and future accounts, contracts, chattel paper, instruments and documents, and all other rights to the payment of money, including but not limited to any Specific Property described below, whether or not yet earned, for services rendered or goods sold, consigned, leased or furnished by the Borrower, *together with all general intangibles, guarantees and securities relating to any of the foregoing,* and all returned, reclaimed or repossessed goods the sale, consignment, lease or other furnishing of which shall have given or may give rise to any of the foregoing, including, without limitation, the right of stoppage in transit (emphasis added).

Secondly, the parties agree that the Bank duly filed financing statements pursuant to the UCC which recited that a security interest was taken in, *inter alia,*

(a) All Debtor's equipment, inventory, accounts, contract rights, and general intangibles, whether now or hereafter acquired;

(b) All proceeds and all products of the property described in Paragraph (a) above; ...

Thirdly, the Line and Term Loan Agreement was amended on July 30, 1986, and July 6, 1987, to allow further advances. At present, the Bank is owed in excess of $1,500,000.00, even after receipt of its share of the sale proceeds.

The Bank's position is that its security interest in the Debtor's "general intangibles," perfected pursuant to the UCC, embraced the funds in issue.

■ One responsive argument made by the Committee is that the passage quoted from the Loan Agreement is ambiguous, and that the term "general intangibles" may be read as qualified by the phrase "relating to any of the foregoing" appearing thereafter. Thus, the Committee contends that it may be that only "general intangibles" relating to "accounts, contracts, chattel paper, instruments and documents, [and] all other rights to payment of money" are covered by the Loan Agreement. We do not agree. Rather, we believe that it is very unlikely that "intangibles" would be limited to those "relating" only to a series of very tangible items, *e.g.,* accounts, contracts, etc. It appears much more logical to construe the "relating to the foregoing" phrase as modifying only "guarantees and securities." It also is far more logical to interpret the Agreement as providing that guarantees and securities "relate to" all of the property recited before, including "general intangibles."

■ A far more convincing argument is the Committee's contention that the funds in issue are excluded from the scope of Article 9 of the UCC. This argument is based upon reference to 13 Pa.C.S. § 9106, which defines "General intangibles" as follows:

"General intangibles." Any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money. All

rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts.

Despite the apparent breadth of this definition, the Committee notes the following caveat in the Official Commentary thereto:

Note that this catch-all definition does not apply to money or to types of intangibles which are specifically excluded from the coverage of the Article (Section 9-104, . . .

The possible relevant exclusions contained in Section 9-104, *i.e.*, 13 Pa.C.S. § 9104, are as follows:

§ 9104. Transactions excluded from division

This division does not apply:

. . . . .

(7) to a transfer of an interest or claim in or under any policy of insurance, except as provided with respect to proceeds (section 9306) and priorities in proceeds (section 9312);

(8) to a right represented by a judgment (other than a judgment taken on a right to payment which was collateral);

. . . . .

(11) to a transfer in whole or in part of any claim arising out of tort; . . .

The Committee contends that the funds in issue are either a "claim . . . under a policy of insurance" or a "claim arising out of a tort." The Bank, meanwhile, contends that the funds are merely "the proceeds of the settlement of a lawsuit," and are not excluded from the scope of the broad definition of "general intangibles."

We have found no precedent precisely on point. The Bank relies on language in five cases to the effect that proceeds of a lawsuit are within the scope of "general intangibles." *Merchants Nat'l Bank v. Ching*, 681 F.2d 1383, 1387–88 (11th Cir.1982); *In re Hanson Industries, Inc.*, 88 B.R. 942, 944 n. 1 (Bankr.D.Minn.1988); *In re Boogie Enterprises, Inc.*, 79 B.R. 4, 6 (Bankr.C.D. Cal.1987); *In re Phoenix Marine Corp.*, 20 B.R. 424, 426 (Bankr.E.D.Va.1982); and *In*

*re Estate of Hill*, 27 Or.App. 893, 557 P.2d 1367 (1976).

All of these cases do involve situations in which creditors having security interests upon "general intangibles" or like designations were found to have security interests upon recoveries in lawsuits. However, none of the lawsuits in issue in those cases involved claims against insurers under insurance policies and therefore none of the courts there had cause to consider the impact of 9-104(g) of the UCC, *i.e.*, 13 Pa.C.S. § 9104(7), on such funds.

Moreover, the holdings in most of these cases are limited in ways that make them of little pertinence to the facts here. In *Ching*, the court allows the secured party to claim an interest in recoveries on purely contractual claims, reversing the lower court only as to a determination that a claim for "rework" of services provided for in a contract was not contractual in nature. 681 F.2d at 1386–87. *Affirmed, inter alia,* is that portion of the lower court decision denying the security party's right to recover funds generated by a "lost profits" claim. *Id.* at 1388–89. The latter claim is held not to have its "basis in the contract," but to constitute "damages arising out of a breach of contract," supporting the lower court's decision that this claim sounds in tort. *Id.* In *Hanson*, in statements which are purely dictum, the court concludes that proceeds "from an impending lawsuit (other than a lawsuit arising solely from tort) constitutes a 'general intangible'. . . ." In *Hill*, the court found that the proceeds of the lawsuit in issue had been expressly assigned to the secured party by the decedent-debtor, and the only issue seems to be whether the funds were nevertheless excluded by operation of 9-104(h) of the UCC, *i.e.*, 13 Pa.C.S. § 9104(8). *Boogie* fails to include any discussion of § 9-104, and it appears that the funds in issue were the settlement proceeds of a contractual claim.

Most supportive of the Bank's position is *Phoenix*, where the court holds, without citation of any authority, that

[w]hile there is some doubt as to the characterization of the Bank of Virginia suit as a tort or contract claim, it is clear

that the dispute is over the *proceeds of the settlement,* not with the claim itself. This passage suggests that, even were the funds in issue proceeds of a tort claim, the fact that the claim was in the form of settlement proceeds renders §§ 9–104(h) and (k) inapplicable.

We believe that the fact that the funds in issue are the fruits of a claim against insurers, a factor absent from all of the foregoing cases, is significant. Clearly, if the Debtor's insurers had simply paid the Debtor for its "business interruption" effected by the damage to its pipeline without the need of the Debtor to resort to a lawsuit in court, there would be little doubt that the funds would be within the scope of § 9104(7). It seems anomalous to conclude that the fact that the insurers were initially recalcitrant in making payments, requiring resort to litigation, creates the Bank's ability to claim a security interest in the funds where it would otherwise have no such rights.

■ Despite the statements of the *Phoenix* court that the nature of the underlying claim, *i.e.,* tort or contract, is irrelevant when litigation on the part of the debtor is necessary to generate funds and the funds are the "proceeds of the settlement," other authorities hold expressly to the contrary. *See Ching, supra,* 681 F.2d at 1388–89; *In re Ore Cargo, Inc.,* 544 F.2d 80, 81–82 (2d Cir.1976); and *Hanson, supra,* 88 B.R. at 944 n. 1. We are not prepared to follow the *Phoenix* decision on this point. We do not believe that the nature of the funds should be dependent upon whether a tortfeasor compensates his victim voluntarily or it is necessary to file a suit to require the tortfeasor to compensate this victim and the suit is settled. The recalcitrance of the tortfeasor, like the recalcitrance of the insurer referenced in the previous paragraph, to pay the Debtor what is due to it should not be a variable which determines whether or not certain funds are excluded from the scope of a security interest under Article 9 of the UCC.

We further note that the "business interruption" loss which underlay the claim against the insurers here, which generated the fund, appears to be in tort. *Compare Ching,* 681 F.2d 1388–89 ("lost profits" claim, which appears to be the equivalent of a "business interruption" claim, sounds in tort). Since the Debtor's claims which resulted in the funds in issue were, therefore, first, a claim under an insurance policy and, furthermore, a claim under an insurance policy to compensate it for a claim which sounds in tort, it appears to us that the funds are within the scope of both 13 Pa.C.S. §§ 9104(7) and (11), and thus excluded from coverage under Article 9 of the UCC. *Compare Arkwright Mutual Ins. Co. v. Bargain City, U.S.A., Inc.,* 373 F.2d 701, 704 n. 9 (3d Cir.1967) (recovery from insurer for "loss of profits" is said to be "beyond the pale" of the UCC in light of the presence of the predecessors to 13 Pa. C.S. §§ 9104(7) and (11)).

■ Although there is no case in the Bank's arsenal which directly supports its position, it is difficult to find a case which directly supports the Committee's position, either. Most of the caselaw surrounding § 9–104(g) of the UCC has addressed two issues which have, at best, tangential relevance to the issues presented in this case: (1) Does this section preclude a secured creditor from claiming the proceeds of insurance which specifically covers damage to his own collateral? (2) Does this section protect the right of an insurance premium financier to claim a secured interest in unearned insurance premiums despite the failure of the financier to record his security interest pursuant to the UCC?

■ The answer to the first question now clearly appears to be "no," in light of decisions by four Circuit Courts of Appeals, including the Third Circuit Court of Appeals, interpreting Pennsylvania law. *Ettinger v. Central Penn Nat'l Bank,* 2 B.R. 385, 388–99 (E.D.Pa.1979), *rev'd* [as to the district court's holding that its decision was prospective only], 634 F.2d 120 (3d Cir.1980); *Brown v. First Nat'l Bank of Dewey,* 617 F.2d 581, 583–85 (10th Cir. 1980); *Paskow v. Calvert Fire Ins. Co.,* 579 F.2d 949, 952–54 (5th Cir.1978); and *PPG Industries, Inc. v. Hartford Fire Ins. Co.,* 531 F.2d 58, 60–61 (2d Cir.1976). How-

ever, we agree with the observation of the Committee and the court in *In re Armando Gerstel, Inc.*, 43 B.R. 925, 931 (Bankr.S.D. Fla.1984), that "[t]he 'proceeds' exception to the exclusion does not apply in the instant case because the insured property was not collateral as to which the insurance would substitute for and follow property covered by a security agreement." The insurance in issue here covered "business interruption" losses; "business interruption" was not an item on which the Bank specifically claimed collateral.

■ The answer to the second question is uniformly affirmative. *See, e.g., Premium Financing Specialists, Inc. v. Lindsey*, 11 B.R. 135, 138 (E.D.Ark.1981); *In re U.S. Repeating Arms Co.*, 67 B.R. 990, 994–97 (Bankr.D.Conn.1986); *In re Air Vermont, Inc.*, 40 B.R. 335, 336–37 (Bankr. D.Vt.1984); *In re Auto–Train Corp.*, 9 B.R. 159, 164–65 (Bankr.D.D.C.1981); *In re Maplewood Poultry Co.*, 2 B.R. 550, 554– 55 (Bankr.D.Me.1980); and *In re Redfeather Fast Freight, Inc.*, 1 B.R. 446, 450–51 (Bankr.D.Neb.1979). The odd aspect of these cases is that the premium insurance financiers argue there that they *are* excluded from Article 9, because specific state statutes uniformly protect their security interests even when they are not recorded.

These cases, which apply § 9–104(g) of the UCC to property insurance, are relevant here only because they implicitly rebut the statement of the district court, in *Ettinger*, 2 B.R. at 393, that the § 9–104(g) exclusion applies to only *life* insurance policies.

The cases which we find most analogous to the instant case, since they involve issues of relative priorities of creditors holding, like the Bank here, a security interest in the Debtor's "general intangibles," are *In re Duke Roofing Co.*, 47 B.R. 990 (E.D. Mich.1985); and *Repeating Arms, supra.* In *Duke Roofing*, the secured creditor was unsuccessful in a contest with a Chapter 7 bankruptcy trustee over unearned insurance premiums recovered on business policies. The court concluded that § 9–104(g) excluded the premiums from the scope of the security interest of the secured creditor, 47 B.R. at 991–92, noting that it might have ruled differently had the case involved a claim of an insurance premium financer under a premium financing agreement. *Id.* at 994. In *Repeating Arms*, the court ruled that an insurance premium financier had priority over the bank holding a security interest in "general intangibles," despite the priority in time of the bank's security interest. 67 B.R. at 997–98.

We therefore have little hesitancy in ruling against the Bank, which also claims a priority here under the UCC on the basis of its security interest in the Debtor's "general intangibles." We note that the Bank's only basis for its contention that it has a secured claim is Article 9 of the UCC. It has no claim under a special statute, like the insurance premium financiers, nor a special contractual claim as a loss payee under the specific policies in issue. As the Committee points out, the Bank could have perhaps established a superior right to the funds by having itself named loss payee on the policy in issue. Having failed to do so, it is compelled to rely on Article 9 of the UCC, which fails to support its secured status.

We note that the result here is consistent with the conclusion in *In re Integrated Testing Products Corp.*, 69 B.R. 901 (D.N. J.1987), that a security interest of a bank in "general intangibles" does not extend to recoveries in preference actions. We also note that, as a partially-unsecured creditor, the Bank will share in distribution of the funds in issue with the other unsecured creditors of the Debtor despite our decision. However, as a result of our decision, it will not receive all of the funds, as it would have had we ruled to the contrary.

An Order granting the relief sought by the Committee in its Answer, *i.e.*, that the funds in issue are property of the Debtor's estate, unencumbered by the Bank's security interest, will be entered.